**In re E.I. DU PONT de NEMOURS & CO., Defendant–Appellant,**

**v.**

**Langdon M. COOPER, Trustee for Bulldog Trucking, Inc., Plaintiff–Appellee.**

Civ. A. No. 3:94CV57–MU.

United States District Court, W.D. North Carolina.

Oct. 13, 1994.

Richard D. Fortin, Jeffrey O. Moreno, Donelan, Cleary, Wood & Maser, P.C., Washington, DC, Robert H. Pryor, Smith, Helms, Mulliss & Moore, Charlotte, NC, for E.I. Du Pont de Nemours & Co.

Langdon M. Cooper, Alala Mullen Holland & Cooper, P.A., Gastonia, NC, Joseph L. Steinfeld, Jr., Sims Walker & Steinfeld, P.C., Washington, DC, for Langdon M. Cooper, Trustee for Bulldog Trucking, Inc.

## ORDER AFFIRMING DECISION OF BANKRUPTCY COURT DENYING DEFENDANT'S MOTION TO AMEND ORDER OF REFERRAL

MULLEN, District Judge.

This matter came on to be heard on the appeal of E.I. duPont de Nemours & Co. (the "Defendant–Appellant") of the Order of the Bankruptcy Court entered on February 18, 1994, denying the motion of the Defendant–Appellant to modify the stay of Section 362 of the Code to permit it to pursue before the

Interstate Commerce Commission (the "ICC" or the "Commission") a statutory claim of unreasonable practice created by Section 2 of the Negotiated Rates Act of 1993 (the "NRA"), Pub.L. No. 103–180, 107 Stat. 2044; and the Court has carefully and thoroughly considered the record, including the Order and Memorandum Decision of the Bankruptcy court, and the briefs of Langdon M. Cooper, Trustee in Bankruptcy for Bulldog Trucking, Inc. (the "Plaintiff–Appellee") and the Defendant–Appellant; and the Court has noted the Defendant–Appellant's request for an expedited consideration of this case; and this Court has determined that the Bankruptcy Court's Order should be affirmed.

In this regard the Court finds and concludes as follows:

This Court has jurisdiction to hear this appeal pursuant to 28 U.S.C. § 158. The Bankruptcy Court's findings of fact are reviewed under the "clearly erroneous" standard, and its conclusions of law are reviewed *de novo. Travelers Ins. Co. v. Bryson Properties XVIII*, 961 F.2d 496, 499 (4th Cir. 1992), *cert. denied,* —— U.S. ——, 113 S.Ct. 191, 121 L.Ed.2d 134 (1992). This appeal concerns only the Bankruptcy Court's conclusions of law and hence should be considered *de novo* based on the facts found by the Bankruptcy Court.

This appeal raises an issue with broad national implications. The general issue is whether Section 2 of the NRA can retroactively forfeit and modify certain assets of the bankruptcy estate of a defunct motor carrier (like Bulldog Trucking Company, the Debtor herein), *i.e.,* its freight undercharge claims, which are protected by the anti-forfeiture provisions of Sections 363(*l*) and 541(c)(1)(B) of the United States Bankruptcy Code (the "Code"), 11 U.S.C. §§ 363(*l*) and 541(c)(1)(B).

The first specific issue for this Court to determine is whether the Bankruptcy Court, in its Order, correctly concluded that Section 9 of the NRA, its legislative history, and 11 U.S.C. §§ 362, 363 and 541 cause Section 2 of the NRA to be "inapplicable" to the Bulldog estate and its Trustee, the Plaintiff/Appellee. The second specific issue for this Court to determine is whether the Bankruptcy Court then correctly denied Defendant/Appellant's motion.

This case is typical of many similar cases appearing since the 1980 deregulation of the trucking industry that have been filed by bankruptcy trustees of motor common carriers and motor common carriers who are themselves debtors-in-possession. The usual fact pattern involves a motor carrier who negotiated with a shipper to charge that shipper less than the tariff rate the Interstate Commerce Act ("ICA") 49 U.S.C. § 10101 *et seq.* required the carrier to publish and file with the ICC. After the shipments were delivered, and after the shipper paid for the shipments at the "negotiated" rate, the carrier filed a bankruptcy petition.

Since the carrier charged less than the published tariff rate the carrier's bankruptcy trustee contends was the lawful rate, the trustee asserts that a claim exists in favor of the carrier's bankruptcy estate against the shipper for the difference between what the carrier's bankruptcy trustee contends is the lawful filed rate and the parties' negotiated rate. When a bankruptcy petition is filed by or against the carrier, this freight undercharge claim becomes property of the carrier's bankruptcy estate under 11 U.S.C. § 541 which the debtor's trustee may use under 11 U.S.C. § 363(*l*). The carrier's bankruptcy trustee or the carrier as a debtor-in-possession then files suit against the shipper to collect the difference, *i.e.,* to collect the freight undercharges. Whether the freight undercharge claim is meritorious is a matter for the court to determine. This case is such an action.

The district courts, and hence the bankruptcy courts, clearly have jurisdiction of these cases, *i.e.,* these adversary proceedings, under 49 U.S.C. § 11706(a), 28 U.S.C. §§ 1334 and 157. The NRA makes no changes in this law. If the courts desire, and if the courts believe the ICC can aid them in deciding specific issues, the courts may but are not required to "refer" these cases of the ICC under the doctrine of primary jurisdic-

tion.[1] *Peter C. Reiter v. Langdon M. Cooper*, 507 U.S. ——, ——, 113 S.Ct. 1213, 1219–20, 122 L.Ed.2d 604, 617 (1993) ("*Reiter*").

On April 6, 1992, the Plaintiff/Appellee filed this adversary proceeding against Defendant/Appellant to collect approximately $ 1.6 million of freight undercharges. On June 24, 1992 the Plaintiff/Appellee moved the Bankruptcy Court for summary judgment, and shortly thereafter the Defendant/Appellant filed a cross motion for summary judgment.

On April 13, 1993, the Bankruptcy Court denied Defendant/Appellant's cross motion for summary judgment, and granted but did not enter partial summary judgment against the Defendant/Appellant and in favor of the Plaintiff/Appellee. On April 13, 1993, the Bankruptcy Court, pursuant to the requirement of *Reiter*, also modified the automatic Stay of 11 U.S.C. § 362 to permit the Defendant/Appellant to present to the ICC in an administrative reparations action before the ICC any claim of rate unreasonableness it had, and stayed this adversary proceeding for twelve months for the limited purpose of allowing the Defendant/Appellant to request from the ICC a determination as to whether Bulldog's applicable published tariff rates were reasonable, and if the ICC determined that those rates were not reasonable for it to determine what was the reasonable rate and then to award reparations in the amount of the difference between the sum of the tariff rates and the sum of the reasonable rates for the shipments. Defendant/Appellant filed its complaint before the ICC on May 14, 1993.

For reasons not material to this appeal, on October 8, 1993, the Plaintiff/Appellee moved the Bankruptcy Court to make a Rule 54 certification and enter final summary judgment against the Defendant/Appellant. On November 1, 1993, the Bankruptcy Court denied as premature the Plaintiff/Appellant's motion for the Rule 54 certification and immediate entry of final judgment.

On December 3, 1993, the NRA was signed into law by the President. On January 12, 1994, the Defendant/Appellant moved the Bankruptcy Court to expand its prior (April 1993) modification of the stay to allow it to pursue before the ICC all remedies afforded under the NRA. The ICC also filed a brief in this case, which the Court has considered. On January 14, 1994, the Plaintiff/Appellee moved the Bankruptcy Court to reconsider its order issued from the bench on November 1, 1993, denying the Plaintiff/Appellee's earlier motion for a Rule 54 certification and immediate entry of final judgment in his favor.

On February 1, 1994, the Bankruptcy court, after due prior notice to all parties, conducted a consolidated hearing in numerous pending freight undercharge adversary proceedings where it reviewed the record and heard oral argument on all pending motions from all parties, including the ICC. After the hearing the Bankruptcy Court announced it would enter summary judgment in favor of the Plaintiff/Appellee, grant his motion for a Rule 54 certification and deny the motion of the Defendant/Appellant for an amendment to the referral order of April 13, 1993, to allow the Defendant/Appellant to assert remedies under the NRA.

On February 18, 1994, the Bankruptcy Court entered the Order which is the subject of this appeal, and it also entered recommended orders granting the Plaintiff/Appellee's motion for summary judgment and the Rule 54 certification. On June 21, 1994, Judge Robert Potter of this Court adopted the recommended orders of the Bankruptcy Court and entered an Order and Judgment in favor of the Plaintiff–Appellee in the amount of $1,339,853.30 plus interest and costs.

Bulldog was, at all times relevant to these proceedings, a motor common and contract carrier operating in interstate commerce pursuant to authority issued by the ICC. It provided shipping services to its customers ("shippers") primarily in the Southeast United States.

1. Technically "referral" is a misnomer. The court merely stays its case to enable a party to file an administrative complaint before the agency. *Reiter*, 507 U.S. at ——, n. 3, 113 S.Ct. at 1220, n. 3, 122 L.Ed.2d at 617, n. 3.

Beginning in the 1980's, the ICC illegally sought to dismantle the national tariff system that required common carriers to file tariffs with the ICC and to collect the tariff rates from shippers, regardless of any private discount, rebate or kickback agreement between the carrier and the shipper.

In 1986 and 1989, the ICC adopted its *Negotiated Rates* policy that the Supreme Court later declared illegal. Under this policy, the ICC barred a common carrier from enforcing its filed tariff rate if the carrier had billed the shipper for a lower, unfiled (or "negotiated") rate. In *NITL—Petition to Institute Rulemaking on Negotiated Motor Common Carrier Rates,* 5 I.C.C. 2d 623 (1989) the ICC publicly announced that it approved of the shippers' defense that it was an unreasonable practice to collect a rate higher than the rate negotiated. In *Maislin Industries, U.S., Inc. v. Primary Steel, Inc.,* 497 U.S. 116, 110 S.Ct. 2759, 111 L.Ed.2d 94 (1990) *("Maislin")* the United States Supreme Court held the *"Negotiated Rates"* policy of the ICC invalid under the ICA as it rendered meaningless the mandate of 49 U.S.C. § 10761 that a carrier must charge and collect its filed rate.

Judge Marvin R. Wooten of the Bankruptcy Court is well known nationally for his correct understanding of this mandate, and his judgment that a carrier must charge and collect its filed rate was upheld by the United States Supreme Court in *Reiter.*

Bulldog did not survive the period of illegal rate destabilization [2] promoted by the ICC's *Negotiated Rates* policy. By petition filed on December 11, 1990, with the U.S. Bankruptcy Court for the Western District of North Carolina, Bulldog sought to effect a reorganization with its creditors pursuant to the provisions of Chapter 11 of the U.S. Bankruptcy Code. On February 14, 1991, Bulldog's Chapter 11 case was converted to a Chapter 7 liquidation and Plaintiff/Appellee Langdon M. Cooper was appointed Chapter 7 Trustee. The Bankruptcy Court thereafter authorized the Plaintiff/Appellee as Trustee, to employ

professionals to pursue over $ 7 million in freight undercharge claims against the shippers that received illegal discounts from Bulldog.

Bulldog no longer transports property for compensation. The primary asset of Bulldog's bankruptcy estate consists of the right to recover freight undercharges from the shippers that extracted illegal discounts from Bulldog while it became insolvent and neglected to pay its employees, numerous taxing authorities and other creditors. Bulldog owes more than 1,000 creditors in excess of $16 million in priority wage and tax claims, and other claims. The Plaintiff/Appellee has approximately $ 9 million of assets, of which approximately $ 7 million are freight undercharges. Without collection of these claims it will be impossible to pay Bulldog's creditors any material dividend.

In 1992 the ICC promulgated invalid regulations (the "MC–208 Regulations") to prevent the Plaintiff/Appellee and the other trustees of other non-operating carriers from collecting freight undercharges. These MC–208 Regulations applied to all "non-operating carriers" and their trustees, and prohibited them from pursuing or asserting certain freight undercharge claims without the prior consent of the ICC. *See* 49 C.F.R. § 1321.1–1321.7 (1992). The MC–208 Regulations threatened the Plaintiff/Appellee with civil and/or criminal penalties if he sought to disregard their mandate.

The MC–208 Regulations were invalidated by the courts on multiple grounds. Judge Robert Potter of the District Court for the Western District of North Carolina enjoined enforcement of the MC–208 Regulations against Plaintiff/Appellee on the ground that they violated the automatic stay of 11 U.S.C. § 362(a)(3). *Langdon M. Cooper, Trustee v. Interstate Commerce Commission, et al.,* 150 B.R. 912 (W.D.N.C.1992). This case has been recently settled and the Plaintiff–Appellee has recovered nearly $40,000 in attorneys fees from the Interstate Commerce Commis-

---

**2.** One of the purposes of the filed rate doctrine is rate stabilization. *Maislin,* 497 U.S. at 126, 110 S.Ct. at 2766, 111 L.Ed.2d at 108 ("The duty to file rates with the Commission, *see* [49 U.S.C.] § 10762, and the obligation to charge only those

rates, *see* [49 U.S.C.] § 10761, have always been considered essential to preventing price discrimination and stabilizing rates."). Congress mandated that tariff rates provide for a "reasonable profit" for carriers (49 U.S.C. § 10701(e)).

sion. In addition, in a Hobbs Act proceeding in which the Plaintiff/Appellee was an active party, the Third Circuit Court of Appeals invalidated the MC–208 Regulations on the ground that they violated the ICA. *See White v. United States,* 989 F.2d 643 (3rd Cir.1993).

Beginning no later than 1988, the Committee on Public Works and Transportation ("Public Works Committee") of the House of Representatives considered legislation to modify the freight undercharge claims of motor carriers that were "in financial reorganization" or "bankruptcy proceedings."

If this legislation had been enacted in 1988, then there would have been little need for the NRA in 1993. However, the Committee on the Judiciary ("Judiciary Committee") of the House of Representatives asserted jurisdiction of the 1988 proposed legislation. At all relevant times the Judiciary Committee has had legislative jurisdiction of bills that amend either the Bankruptcy Code or the provisions of Title 28 relating to the federal judiciary. *See Rules of the House of Representatives,* Rule X(1). The Judiciary Committee stated that it would object to any legislation that would affect either the Bankruptcy Code or the jurisdiction of the courts. Thereafter, Congress failed to enact any legislation during that term to limit the undercharge claims of defunct motor carriers.

By 1992 the word "bankruptcy" no longer appeared in the Public Works Committee's proposed anti-undercharge legislation. In an obvious attempt to circumvent the Judiciary Committee's jurisdiction of bankruptcy legislation, the 1992 bill provided that it applied to motor carriers that were "no longer transporting property"—even though the undercharge claims of bankrupt carriers remained the target of the proposed legislation. *See generally,* S.Rep. No. 359, 102d Cong., 1st Sess. at 5, 9.

However, this change in drafting technique failed to deflect the attention of the Judiciary Committee. In September 1992 the Judiciary Committee asserted jurisdiction of this proposed legislation on the grounds that it implicated both bankruptcy and judicial jurisdiction issues. As in 1988, Congress failed to

enact legislation to limit the undercharge claims of defunct carriers.

In 1993 the Public Works Committee again considered an anti-undercharge bill, H.R. 2121. As described below, after a last minute compromise with the Judiciary Committee, the text of H.R. 2121 was enacted as the NRA. *See generally,* H.R.Rep. No. 359, 103d Cong., 1st Sess., at 1–26, U.S.Code Cong. & Admin.News 1993, 2534 (1993); 139 Cong.Rec.H. 9593–9596 (daily ed. November 15, 1993); Letter of Chairman Jack Brooks to Representative Norman Mineta dated November 10, 1993; Letter of Representative Norman Mineta to Chairman Jack Brooks dated November 15, 1993.

On November 10, 1993, as in 1988 and 1992, the Judiciary Committee asserted legislative jurisdiction of the anti-undercharge bill, H.R. 2121, under consideration by the Public Works Committee. *See* Letter of chairman Jack Brooks to Representative Norman Mineta dated November 10, 1993. By letter dated November 10, 1993, Mr. Jack Brooks, Chair of the Judiciary Committee, requested referral of that bill to the Judiciary Committee for hearings. *Id.* Chairman Brooks wrote:

[T]he legislation, as currently drafted, implicates *two separate* areas of subject matter clearly within the jurisdiction of the Committee on the Judiciary: *bankruptcy law* and procedure *and* the proper division of adjudicatory responsibility between the courts and administrative agencies.

\*    \*    \*    ·    \*    \*    \*

The Committee on the Judiciary has had no opportunity whatsoever to review the legislation and consider its impact on the bankruptcy system, administrative law and the jurisdiction of the Federal courts. Such an opportunity is essential if the Committee is to carry out its mandate to ensure the integrity and consistency of the Code in these areas of the law. *Id.* (emphasis added).

To prevent the Judiciary Committee from again blocking passage of the proposed NRA, the Public Works Committee added a new Section 9 to H.R. 2121 that had not existed in any of the pre-November 1993 versions of

the bill. The November 10, 1993, version of Section 9—and the final version of Section 9—made clear that the proposed NRA would *not* limit the Bankruptcy Code. The November 10, 1993, version of proposed Section 9 of the NRA provided:

Nothing in this Act (including any amendment made by this Act) shall be construed as limiting or otherwise affecting applicability of title 11, United States Code, relating to bankruptcy, or the Employee Retirement Income Security Act of 1974. *See* H.R.Rep. No. 359, 103d Cong., 1st Sess. at 13, U.S.Code Cong. & Admin.News 1993, at 2540.

The November 15, 1993, report of the Public Works Committee on the proposed NRA (H.R. 2121) confirmed that, as amended by new Section 9, the proposed NRA would not amend the Bankruptcy Code. This committee report contained a letter dated November 15, 1993, from Mr. Norman Y. Mineta, the principal sponsor of the NRA and Chair of the Public Works Committee, that gave the following written assurances to the Judiciary Committee:

Because of your Committee's jurisdiction over Federal courts and bankruptcy, I recognize your right to request a sequential referral of H.R. 2121 [the proposed NRA]. However, and in accordance with your letter, I am pleased that we were able to agree on language clarifying that we do not intend in this legislation to affects [sic] either the Bankruptcy Code or the jurisdiction of the bankruptcy courts. Based on our agreement, it is my understanding that you will not pursue sequential referral. *See* H.R.Rep. No. 359, 103d Cong., 1st Sess. at 16, U.S.Code Cong. & Admin.News 1993, at 2543.

On the same day, the Chair of the Judiciary Committee responded to this November 15, 1993, letter by confirming that the Judiciary Committee would not assert legislative jurisdiction of the proposed NRA.[3] *Id.* As a result, the Judiciary Committee never conducted hearings on the bankruptcy ramifications of the NRA.

On November 15, 1993, the same day that the Public Works Committee favorably reported the proposed NRA as H.R. 2121, the House made certain technical amendments to the bill. The Chair of the Public Works Committee explained these amendments on the House floor:

Finally, Mr. Speaker, I would note that we have made a few technical and clarifying amendments to the bill today. Among them, we are clarifying in section 9 of the bill that we do not intend in this legislation to affect either the bankruptcy code or the jurisdiction of the bankruptcy courts, matters over which our committee does not have jurisdiction. 139 Cong.Rec. H 9603.

The above-described "technical and clarifying amendments" resulted in the final version of Section 9 of the NRA as enacted. It provided:

Nothing in [the NRA] (including any amendment made by [the NRA]) shall be construed as limiting or otherwise affecting application of title 11, United States Code, relating to bankruptcy; title 28, United States Code, relating to jurisdiction of the courts of the United States (including bankruptcy courts); or the Employee Retirement Income Security Act of 1974. *Id.* at 9596.

The House thereafter substituted the text of this new version of the proposed NRA/ H.R. 2121 for S. 412[4] and passed S. 412. *Id.* at 9657–9658. Shortly thereafter, the Senate enacted S. 412 as amended. *See* 139 Cong. Rec. S 16183–16187 (daily ed. November 18, 1993); Pub.L. 103–180, 107 Stat. 2044. The President signed S. 412 into law as the NRA on Friday, December 3, 1993.

Section 2(a) of the NRA adds a new subparagraph (f) to 49 U.S.C. § 10701. New Section 10701(f) gives shippers an option to satisfy the freight undercharge claims of

---

**3.** Chairman Brooks' November 15, 1993, letter, unlike his November 10th letter, stressed the jurisdictional ramifications of the proposed NRA because its proposed Section 9 had not yet been amended to mention Title 28, relating to judicial jurisdiction.

**4.** S. 412 was an earlier version to the NRA that the Senate passed in 1993. As stated, the final version of the NRA consisted of S. 412 after the House substituted the text of H.R. 2121 as amended (containing the final version of Section 9 of the NRA) for the text of S. 412.

specified motor carriers at discounts of 80%–100% of the amount of the undercharge claim. A shipper that is a "small business concern" is entitled to a *100%* discount under 49 U.S.C. § 10701(f)(9)/NRA § 2(a)[5]. In other words, Section 2(a) of the NRA gives a shipper that is a small business concern a total defense to the undercharge claims of the type of motor carrier specified in Section 2(a).

Section 2(a) of the NRA specifies that the only type of motor carrier that suffers this deprivation of its right to recover undercharges is a "motor carrier of property ... under subchapter II of chapter 105" of Title 49 that "is no longer transporting property or is transporting property for the purpose of avoiding the application" of Section 2(a) of the NRA. The term "motor carrier" of property is defined in 49 U.S.C. § 10102(13)–(15) as a motor contract carrier "for compensation," or a motor common carrier "for compensation."

Section 2(c) of the NRA makes Section 2(a) apply retroactively to all pending freight undercharge claims.[6] This makes the NRA apply to Bulldog's freight undercharge claims even though the NRA was enacted approximately three years after the undercharge claims of Bulldog arose and vested in its bankruptcy estate under 11 U.S.C. § 541(a).

Section 2(e) of the NRA retroactively overrules the Supreme Court's *Maislin* decision as to the undercharge claims of defunct motor carriers subject to Section 2(a) of the NRA. Section 2(e) accomplishes this 100% forfeiture of *Maislin*–type undercharge claims by declaring such claims to be an "unreasonable practice" when asserted by a defunct motor carrier.[7] It is Section 2(e) of the NRA which would completely eliminate most of Bulldog's freight undercharge claims.

Section 2(f) of the NRA retroactively permits the ICC to declare null and void any prior, Court approved settlements of freight undercharge claims of the Plaintiff/Appellee which the ICC alone determines to have been brought about "as a result of fraud or coercion".[8]

Section 2(g) of the NRA amends 49 U.S.C. § 10701(e). Prior to this amendment, Sec-

---

5. As added by Section 2(a) of the NRA, 49 U.S.C. § 10701(f) provides in relevant part that:
    (a) Section 10701(f) applies to the freight undercharge claims of a "motor carrier of property ... providing transportation subject to the jurisdiction of the [ICC] under subchapter II of chapter 105 of this title [*i.e.,* freight motor carriers for compensation under 49 U.S.C. §§ 10102(13)–(15) and 10521]" where "the carrier ... is no longer transporting property or is transporting property for the purpose of avoiding the application of" Section 2(a) of the NRA.
    (b) Section 10701(f)(2) gives shippers of shipments of 10,000 pounds or less the option to settle the defunct carrier's undercharge claim at 20% of the amount of the undercharge (*i.e.,* at a discount of 80%). Subparagraphs (3)–(4) gives other shippers options to settle undercharge claims of defunct carriers at discounts of 85%–95% of the amount of the undercharge claim.
    (c) Section 10701(f)(9) provides that: "Notwithstanding paragraphs (2), (3), and (4) [of Section 10701(f)], a person from whom the additional legally applicable and effective tariff rate or charges are sought shall not be liable for the difference between the carrier's applicable and effective tariff rate and the rate originally billed and paid—(A) if such person qualifies as a small-business concern under the Small Business Act...." (emphasis added).

6. Section 2(c) of the NRA provides that: "The amendments made by [NRA § 2(a)–(b)] shall apply to all claims pending as of the date of the enactment of this Act and to all claims arising from transportation shipments tendered on or before the last day of the 24-month period beginning on such date of enactment."

7. Section 2(e) of the NRA provides in relevant part:
    ... it shall be an unreasonable practice (under 49 U.S.C. § 10701) for a motor carrier of property ... or a party representing such carrier ... to attempt to charge or to charge for a transportation service provided before September 30, 1990, the difference between the applicable rate that is lawfully in effect pursuant to a (filed tariff) ... and the negotiated rate for such service if the carrier is no longer transporting property ... or is transporting property ... for the purposes of avoiding the application of this subsection.

8. Section 2(f) of the NRA provides:
    Any claim that, but for this subsection, would be subject to any provision of this Act (including any amendment made by this Act) and that was settled by mutual agreement of the parties to such claim, or resolved by a final adjudication of a Federal or State court, before the date of enactment of this Act shall be treated as binding, enforceable, and not contrary to law, unless such settlement was agreed to as a result of fraud or coercion.

tion 10701(e) authorized *all* motor carriers to defend against rate unreasonableness counterclaims of shippers by asserting that the filed rates charged were justified by the carrier's financial condition, *i.e.*, that the carrier's rates were justified by the carrier's need for "revenue levels" sufficient to cover "total operating expenses" of the carrier, plus the carrier's need to earn "a reasonable profit." Section 2(g) of the NRA amends Section 10701(e) so that *only* operating carriers—not non-operating carriers of the type specified in Section 2(a) of the NRA—can utilize their costs of service to defend rate reasonableness counterclaims of shippers. Section 2(g) of the NRA thereby denies to Bulldog and other defunct carriers the right to justify their tariff rates based on their costs of service.[9]

Section 9 of the NRA specifically provides that the NRA does *not* limit the Bankruptcy Code. Incredibly, in the face of this plain language virtually all the recent decisions cited by Defendant/Appellant and the ICC have found that the NRA made a *"pro tanto* amendment" of the Bankruptcy Code. Section 9 of the NRA provides:

> **Nothing in [the NRA] (including any amendment made by [the NRA]) shall be construed as limiting or otherwise affecting application of title 11, United States Code, relating to bankruptcy**; title 28, United States Code, relating to the jurisdiction of the courts of the United States (including bankruptcy courts); or the Employee Retirement Income Security Act of 1974. (emphasis added).

As described above, the proponents of the NRA inserted that provision in November 1993 to prevent hearings on the bankruptcy and jurisdictional ramifications of the bill before the Judiciary Committee, which had jurisdiction of such legislation.

Sections 541(c)(1) and 363(*l*) of the Code make ineffective any applicable non-bankruptcy law (actually Section 363 is broader in this respect and says any "applicable law") that applies by reason of the financial condi-

tion of a debtor and that purports to effect a forfeiture, modification, or termination of a debtor's interest in property. Section 9 of the NRA expressly provides that the NRA shall not be construed to limit or otherwise affect Title 11.

Sections 541(c)(1) and 363(*l*) of the Code, which by virtue of Section 9 of the NRA are not in any way limited or affected by the NRA, therefore continue to make ineffective any non-bankruptcy law that, by reason of Bulldog's financial condition, seeks to modify the right of Bulldog, and hence the Plaintiff/Appellee as Trustee, to recover the freight undercharges owed by shippers to the Bulldog bankruptcy estate.

This Court concludes that Sections 2(a)–(c) and (e)–(g) of the NRA are ineffective and unenforceable against the Plaintiff/Appellee:

*First,* the NRA is a "non-bankruptcy law," because its Section 9 expressly provides that the NRA shall not be "construed as limiting or otherwise affecting application of Title 11 ... (or) Title 28 ...".

*Second,* the challenged provisions of the NRA purport to work a forfeiture, modification, and termination of the right of specified motor carriers and their trustees to recover freight undercharges. Section 2(e) of the NRA retroactively eliminates virtually all of Bulldog's freight undercharge claims since they arose prior to October 1990.

*Third,* the applicability of the NRA is conditioned on the financial condition of the carrier as the *only* type of motor carrier affected by the challenged provisions of the NRA is a motor carrier of property for compensation that is no longer transporting property for compensation, *i.e.*, a carrier that doesn't have any revenues from current property transportation operations. Both the express terms of Title 49 and the legislative history of the NRA confirm that Sections 2(a)–(c) and (e)–(g) of the NRA target only bankrupt and other financially defunct motor carriers in clear violation of the anti-forfeiture provisions of 11 U.S.C. §§ 541(c)(1) and 363(*l*).

---

**9.** Section 2(g)'s apparent purpose is to make certain that shippers can withhold all freight undercharges owed to defunct carriers on the ground that the failed carrier's tariff rates were unreasonably high, notwithstanding that the carrier was forced to seek relief under the Bankruptcy Code after it granted discounts from those rates.

*Fourth,* the automatic stay of Section 362(a)(3) of the Code prevents any entity from attempting to use the provisions of Section 2 of the NRA to exercise control over the freight undercharge claims which are property of the Bulldog bankruptcy estate.

The Bankruptcy Court correctly held that Sections 2(a)–(c) and (e)–(g) of the NRA cannot be applied to the Plaintiff/Appellee as the Trustee of Bulldog. As the Bankruptcy Court held, the NRA is "applicable nonbankruptcy law" which applies to Bulldog by reason of Bulldog's financial condition and which purports to effect a forfeiture, modification, or termination of Bulldog's interest in property in violation of 11 U.S.C. § 541(c)(1), 11 U.S.C. § 363(*l*) and Section 9 of the NRA.

Section 541(a) of the Code defines what is property of a debtor's bankruptcy estate. Section 363(*l*) of the Code protects the property of the estate from nonbankruptcy laws that attempt to cause a forfeiture, modification or termination of property rights of a debtor in bankruptcy based on its financial condition.

Section 541(c)(1) provides in relevant part: (c)(1) …, an interest of the debtor in property becomes property of the [debtor's bankruptcy] estate … notwithstanding any provision in applicable nonbankruptcy law—

(B) that is conditioned on the insolvency or financial condition of the debtor, … and that effects or gives an option to effect a forfeiture, modification, or termination of the debtor's interest in property. (11 U.S.C. § 541(c)(1)).

11 U.S.C. § 363(*l*) provides that the "trustee may use, sell, or lease property" of the bankruptcy estate "notwithstanding any provision in a contract, lease *or applicable law* that is conditioned on the insolvency or *financial condition* of the debtor …" (emphasis added)

■ Sections 541(c)(1) and 363(*l*) are two of several provisions of the Bankruptcy Code that invalidate both pre-bankruptcy and post-bankruptcy forfeitures and restraints on the acquisition of the debtor's property by the bankruptcy estate and use by a trustee of a debtor's property based *either* on the bank-ruptcy filing itself, *or* debtor's insolvency, *or* the debtor's financial condition. *See* 11 U.S.C. §§ 363(*l*), 365(e)–(f), 541(c)(1), and 1142; *see also In re Sambo's Restaurants, Inc.,* 24 B.R. 755, 757 (Bankr.C.D.Cal.1982) (Section 365 precluded enforcement of clause based on debtor's financial condition); *In re Government Securities Corp.,* 972 F.2d 328, 330 (11th Cir.1992), *cert denied,* 507 U.S. ——, 113 S.Ct. 1366, 122 L.Ed.2d 744 (1993) (Section 541(c)(1)) rendered unenforceable insurance policy provision that terminated policy based on the appointment of a "receiver or other liquidator" for the insured); *In re Railway Reorganization Estate, Inc.,* 133 B.R. 578, 582 (Bankr.D.Del.1991) (enforcing Sections 363(*l*) and 541(c)(1) and stating that "Clauses which purport to terminate, limit or otherwise modify a debtor's interest in its property upon the filing of a bankruptcy petition are unenforceable under the Code"); *In re Tom Stimus Chrysler–Plymouth, Inc.,* 134 B.R. 676, 679 (Bankr.M.D.Fla.1991) (Section 365 precluded enforcement of state law that provided that car dealership abandoned its franchise if it stopped doing business for 10 consecutive days); *In re Peaches Records and Tapes, Inc.,* 51 B.R. 583, 590 (9th Cir. BAP 1985) (Section 365 precluded enforcement of agreement that restricted assignment of lease if debtor ceased to do business on premises); *In re Taylor Manufacturing, Inc.,* 6 B.R. 370, 371 (Bankr.N.D.Ga.1980) (bankruptcy default clause was unenforceable against lessee).

■ The anti-forfeiture provisions of the Bankruptcy Code abolish the pre-Code practice that permitted third parties to strip debtors of their assets by means of *ipso facto* bankruptcy clauses. These provisions are an essential part of the bankruptcy system created by Congress which prevent third parties from stripping debtors of their assets by means of *ipso facto* bankruptcy clauses in contracts and by means of forfeiture laws aimed at stripping bankrupt debtors of valuable property rights. *See, e.g., Finn v. Meighan,* 325 U.S. 300, 65 S.Ct. 1147, 89 L.Ed. 1624 (1945) (enforcing *ipso facto* clause in lease); 4 L. King, *Collier on Bankruptcy* ¶ 541.22 (15th ed. 1993). Even under pre-Code practice, it was the policy of the bank-

ruptcy courts to interpret such clauses narrowly "so as not to deprive the estate of property which may turn out to be a valuable asset." *Finn*, 325 U.S. at 301, 65 S.Ct. at 1149.

■ Contrary to the argument of the Defendant/Appellant and the ICC, the anti-forfeiture provisions of the Code do not operate only to invalidate "applicable laws" or "applicable nonbankruptcy laws" which prevent a bankruptcy estate from taking title to a debtor's property. Section 363(*l*) of the Code specifically deals with "applicable laws" which interfere with the trustee's use, sale, or lease of property of the estate or which purport to work a "forfeiture, modification, or termination of the debtor's interest in such property." Section 363(*l*) of the Code clearly applies to "applicable laws" which affect the property of the estate in the trustee's control. Were it otherwise, as Defendant/Appellant contends, an "applicable nonbankruptcy law" which under Section 541(c)(1) could not operate to strip a debtor of property before such property becomes part of the bankruptcy estate could operate to cause the bankruptcy estate to forfeit that very same property. Congress could not have intended such an absurd result when it enacted the Code. A ruling to that effect by this Court would be an invitation to creditors and lawmakers to strip bankruptcy estates of a debtor's property by means of carefully crafted contract or statutory provisions which do not take affect until a debtor's property has become part of a bankruptcy estate.

■ Section 363(*l*) of the Code, while not as generally broad or all encompassing as Section 541(c)(1), is clearly focused at defeating "applicable laws" which purport to work a forfeiture or modification or termination of a debtor's interest in property, after such interest has passed to the bankruptcy estate and, therefore, prevents the NRA from working a forfeiture, modification, or termination of the Plaintiff/Appellee's interest in the freight undercharge claims against the Defendant/Appellant.

■ By their terms, 11 U.S.C. §§ 363(*l*) and 541(c)(1) render unenforceable in a debtor's bankruptcy case a law that meets these conditions: (1) the law is a provision of "applicable law" (Section 363(*l*)) or "applicable nonbankruptcy law" (Section 541(c)(1)); that (2) "is conditioned on the insolvency or financial condition of the debtor"; that (3) limits the trustee's right to "use, sell, or lease property" of the debtor's estate under Section 363(b)–(c) of the Code (Section 363(*l*)); and that (4) "effects or gives an option to effect a forfeiture, modification, or termination of the debtor's interest in the property" (Section 541(c)(1)(B)).

Section 363(*l*) of the Code applies to the extent that the challenged law (the NRA) purports to limit the Plaintiff/Appellee's right to use that property. Section 541(c)(1) applies to the extent that the challenged law purports to limit whether the debtor's property becomes property of the Bulldog estate.

■ Bulldog's right to recover freight undercharges constitutes "property" within the protection of 11 U.S.C. § 541 and 11 U.S.C. § 363. *See, Cooper, Trustee v. Interstate Commerce Commission*, 150 B.R. 912 (W.D.N.C.1992) ("The filed rate doctrine creates a property right in (Bulldog) for any freight shipped at a rate less than the tariff rate filed with the ICC at the time of the shipment.... The Trustee's rate undercharge claims, therefore, are property of the estate and are protected by the automatic stay.") Slip Op. entered October 22, 1992, Potter, J. p. 4–5. *See also, Gumport, Trustee v. ICC*, 147 B.R. 770 (Bankr.C.D.Cal.1992) *citing In re Crysen/Montenay Energy Co.*, 902 F.2d 1098 (2d Cir.1990) and *In re: Best Refrigerated Express, Inc.*, 1991 Fed.Carr. Cas. (CCH) ¶ 83,624 (Bankr.D.Neb.1991); *see also* 4 L. King, *Collier on Bankruptcy* ¶ 541.01 at 541–5 (15th ed. 1993) (property of the debtor's estate under 11 U.S.C. § 541 includes the debtor's "causes of action"). This result follows from the broad language of 11 U.S.C. § 541(a), which vests in the bankruptcy estate all "legal or equitable interests of the debtor in property" as of the commencement of the debtor's bankruptcy case. The Supreme Court has stated that Section 541(a)(1)'s "scope is broad," and that "Section 541(a)(1) is intended to include in the estate any property made available to the

estate by other provisions of the Bankruptcy Code." *United States v. Whiting Pools, Inc.,* 462 U.S. 198, 204–05, 103 S.Ct. 2309, 2313, 76 L.Ed.2d 515 (1983) (requiring IRS to return to bankruptcy estate property of debtor that was seized prior to the bankruptcy).

■ The NRA is an "applicable law" under 11 U.S.C. § 363(*l*) because it purports to apply to all motor carriers, *regardless* of whether the carriers are in bankruptcy. The NRA is an "applicable nonbankruptcy law" under 11 U.S.C. § 541(c)(1) because by its own terms it provides explicitly in its Section 9 that it does *not* amend Title 11 (the Bankruptcy Code). The NRA is therefore both "applicable law" and "applicable nonbankruptcy law" within the meaning of 11 U.S.C. §§ 541(c) and 363(*l*).

The Supreme Court has determined that the phrase "applicable nonbankruptcy law" in Section 541 of the Code includes federal statutory law. "Plainly read, the provision (applicable nonbankruptcy law) encompasses any relevant nonbankruptcy law, including (any) federal law ..." *Patterson v. Shumate,* 504 U.S. ——, ——, 112 S.Ct. 2242, 2246, 119 L.Ed.2d 519 (1992). Similarly, it is obvious that the broader term "applicable law" in Section 363(*l*) of the Code would also encompass any federal law.

Some of the recent district court decisions of which the Court is aware appear to hold that the word "law" in Sections 363(*l*) and 541(c)(1)(B) of the Code refers exclusively to "state law." This flies flatly in the face of the holding in the *Patterson* case.

■ Sections 2(a)–(c) and (e)–(g) of the NRA apply by their terms *only* to (1) a "motor carrier of property" that is (2) providing transportation subject to the jurisdiction of the [ICC] under subchapter II of Chapter 105 of Title 49 provided that (3) the motor carrier "is no longer transporting property, or is transporting property for the purpose of avoiding the application" of the NRA. Defendant/Appellant contends that because the NRA does not specifically use the phrases

"bankruptcy" or "financial condition", and may apply to carriers which are not bankrupt or insolvent, it is not an "applicable nonbankruptcy law" conditioned on the financial condition of the debtor. *See* Brief of Defendant/Appellant at p. 13. This Court is aware of the recent bankruptcy and district court decisions which support the position of the Defendant/Appellant. However, this Court believes they are incorrectly decided. Their interpretation of the NRA cannot survive an examination of its provisions and the relevant legislative history surrounding its passage.

As explained below, the text of Section 2 of the NRA, a basic understanding of accounting, and the legislative history of the NRA all show that it applies *only* to motor carriers having a specified "financial condition" within the meaning of 11 U.S.C. § 363(*l*) and § 541(c)(1): namely a lack of revenues generated from the ongoing transportation of property.

The recent decisions brought to the attention of this Court by Defendant/Appellant and the ICC miss the point when they state that Section 2 of the NRA is not conditioned on the "bankruptcy" or "insolvency" of the carriers subject to Section 2.

Sections 363(*l*) and 541(c)(1) of the Code protect against laws "conditioned on the insolvency *or* financial condition of the debtor, on the commencement of [bankruptcy] case ... *or* on the appointment of *or* the taking of possession by a trustee...." The Plaintiff/Appellee challenges Section 2 of the NRA because it is conditioned on the "financial condition" of the class of defunct freight carriers specified in Section 2—*not* because Section 2 is conditioned on the bankruptcy or insolvency or such carriers.[10]

The words *"motor carrier"* and *"no longer transporting property"* in Section 2(a) of the NRA are the key statutory words that condition the application of the challenged provisions of Section 2 on the financial condition of Bulldog and other defunct motor carriers of property:

---

**10.** The legislative history of the NRA indicates that its proponents refrained from using the word "bankruptcy" in the NRA in order to circumvent hearings before the Judiciary Committee, which would have taken jurisdiction of any bill that had bankruptcy ramifications.

(1) *"Motor carrier"* is statutorily defined in 49 U.S.C. § 10102(13)–(15). These provisions specify that "motor carrier" means either a motor common carrier *"for compensation"* (49 U.S.C. § 10102(13)–(14)), or a motor contract carrier *"for compensation"* (49 U.S.C. § 10102(13) and (15)).[11]

(2) Thus, a "motor carrier" of property that "is no longer transporting property" within the meaning of Section 2(a) of the NRA means a motor carrier of property *for compensation* that is no longer transporting property *for compensation*. In plain English, this statutory language means "a motor carrier that is no longer generating revenues from current transportation of property." By definition, any such motor carrier has a "financial condition" characterized by a lack of revenues from ongoing transportation of property.[12]

For some unknown reason, Judge Hill, in the recent *Transcon* decision cited by the Defendant/Appellant and the ICC, disregarded the uncontroverted expert opinion testimony of a certified public accountant, S. Chelliah. Mr. Chelliah explained in detail that, when used to describe a motor carrier of property, the phrase "no longer transporting property" refers to and describes the carrier's financial condition and would have to be disclosed on the carrier's audited financial statements.

A company's revenues from operations are reflected on the statement of income section of a carrier's financial statement, which is the document that depicts a company's "financial condition." It is impossible to draw a distinction between a carrier's "financial condition" and its "operating condition." Revenues are part of a company's "financial condition" even if they also relate to the company's "operations." *See, e.g., Berger, Practical Accounting for Lawyers,* p. 205 (John Wiley & Sons, Inc. 1981) (explaining that the income section of a financial statement should report separately the "results of operations of a discontinued segment of a business"); 1 Newton, *Bankruptcy and Insolvency Accounting* § 5.25, p. 223 (John Wiley & Sons, Inc. 5th ed. 1994) (explaining that types of financial information that "could be of considerable benefit to the creditors and stockholders in assessing the potential of the debtor's business include the results of operations for the past year").

Lenders also agree that a debtor's shutting down business operations is material to its "financial condition." For example, a standard form of lender's security agreement includes the following defined "events of default:" (1) the debtor's insolvency, (2) the debtor's failure to dismiss the filing of a bankruptcy petition, (3) the appoint of a receiver for the debtor, and (4) the debtor's *"ceas[ing] to conduct its business as the same is now conducted in the ordinary course of its business*[.]*"* L. King, *Collier Lending Institutions and the Bankruptcy Code* ¶ 2.51 at 2–176–177 (1993 ed.) (emphasis added). The same treatise advises that loan provisions that "create defaults for reasons other than failure to make payment when due. . . . *provide an early warning device to the lender, to signal that the borrower may have fallen into troubled financial circumstances* . . . ." *Id.* at ¶ 2.02[1], at 2–4 (empha-

---

**11.** 49 U.S.C. § 10102(13) provides that "motor carrier" means "a motor common carrier and a motor contract carrier."

49 U.S.C. § 10102(14) of Title 49 provides that "motor common carrier" means "a person holding itself out to the general public to provide motor vehicle transportation *for compensation* over regular or irregular routes, or both." (Emphasis added.)

49 U.S.C. § 10102(15)(B) provides that a "motor contract carrier" of property means "a person providing motor vehicle transportation of property *for compensation* under continuing agreements with one or more persons. . . ." (Emphasis added.)

49 U.S.C. § 10521, which appears in subchapter II of chapter 105 of Title 49 (*see* Section 2(a) of H.R. 2121), gives the ICC jurisdiction "over transportation by motor carrier," which, by reason of 49 U.S.C. §§ 10102(13)–(15), means "transportation by motor carrier *for compensation*." (Emphasis added.)

**12.** For such defunct carriers, the recovery of freight undercharges from former customers will always be a more substantial asset than the non-existent revenues from ongoing operations. Further, only a defunct carrier or its trustee is likely to sue the carrier. In contrast, an operating carrier will forebear from suing in order to obtain the customer's future trade.

sis added).[13]

The legislative history of the NRA removes any doubt that Congress intended to condition Section 2's forfeiture and modification provisions on the financial condition of financially defunct motor carriers.

In June 1993 the Senate first passed S. 412, which closely resembled its final version (adopting H.R. 2121 as amended). The Senate committee report on S. 412 stated on its first page:

> The bill, as reported, is intended to alleviate the freight motor carrier "undercharge" litigation crisis by establishing a statutory procedure for resolving disputes resulting from efforts by *trustees for bankrupt motor carriers or nonhousehold goods forwarders* to collect additional amounts for past transportation provided.... S.Rep. No. 79, 103d Cong., 1st Sess. at 1 (emphasis added).

This committee report shows that Congress contemplated that a non-operating motor carrier would be financially defunct.

The transcript of the June 1993 hearings on H.R. 2121, which became the NRA, confirms the conclusion that Section 2 of the NRA targets financially defunct carriers. *See generally Hearing on the Negotiated Rates Issue and Proposed Legislative Solutions Thereto Before the House Subcommittee on Surface Transportation of the Committee on Public Works and Transportation,* 103rd Cong., 1st Sess. (June 15, 1993) (the *"Hearings"*). That transcript contains extensive discussion of the problems caused by undercharge claims asserted by trustees of bankrupt motor carriers. *See Hearings.* During these hearings, the following exchange took place between Representative Laughlin and Mortimer Downey, Deputy Secretary of the U.S. Department of Transportation:

> REP. LAUGHLIN: .... I appreciate all the legislation pending on this issue—the

only entities that it applies to are the bankrupt carriers; is that correct?
> MR. DOWNEY: That is correct.
>
> \*   \*   \*   \*   \*   \*
>
> MR. DOWNEY: .... These carriers are bankrupt. They are no longer in business.

*Hearings* at 23. Similarly, in endorsing H.R. 2121, Thomas Donohue, the President of the American Trucking Association, stated that the provisions of H.R. 2121 are applicable "[o]nly to claims by defunct (*i.e.*, bankrupt) carriers" *Hearings* at 202. Representative Jennifer Dunn, a co-sponsor of H.R. 2121, explained to the Subcommittee that the legislation addressed "a legal morass where bankrupt trucking companies are suing businesses, large and small" *Hearings* at 22. Throughout the *Hearings,* there are repeated references to the need for legislation to restrict the freight undercharge claims asserted by such bankrupt carriers as Transcon and P\*I\*E. *See, e.g., Hearings* at 338–39 (testimony of Gail McDonald, Chair of ICC) and 116 (resolution of Transportation Claims & Prevention Council, Inc.).

The November 1993 House committee report on H.R. 2121 (which, as stated, became the NRA) explained:

### PURPOSE AND SUMMARY

The purpose of H.R. 2121, as reported, is to provide a statutory process for resolving disputes for claims involving negotiated transportation rates *brought about by trustees for non-operating motor carriers for past transportation services.* H.R.Rep. No. 359, 103d Cong., 1st Sess., at 7 U.S.Code Cong. & Admin.News 1993, at 2534 (1993) (emphasis added).

This same committee report described the freight undercharge disputes addressed by the NRA:

> If a motor carrier ceases operation and files for bankruptcy, the receiver or trustee frequently retains an auditor to search

---

**13.** Moreover, the term "financial condition" cannot be narrowly read in this case without improperly causing damage in other cases. Sections 363(*l*) and 541(c)(1) of the Bankruptcy Code protect equally all debtors in bankruptcy cases, not just failed motor carriers. A narrow

interpretation of the words "financial condition" today means that tomorrow every creditor and governmental entity will seek to enforce *ipso facto* forfeitures against all debtors in bankruptcy on the ground that they no longer have business operations and/or revenues and/or income.

the records of the carrier for instances in which the rates billed and collected were lower than the applicable rates on file at the ICC. When these discrepancies are discovered, the receiver or trustee then files a collection action to recover the difference from the shipper. *Id.* at 8.

The above-quoted portions of the committee report remove any doubt that the NRA targets freight undercharge claims belonging to the trustees of financially defunct carriers.

■■■ In violation of 11 U.S.C. § 363(*l*), Section 2(a) of the NRA purports to limit the Plaintiff/Appellant's right to "use, sell or lease" Bulldog's freight undercharge claims "under subsection (b) or (c)" of Section 363 of the Code. Subsections (b) and (c) of Section 363 of the Code permit Plaintiff/Appellee to use estate property both out of the ordinary course of business and in the ordinary course of business. Thus, together subsections (b) and (c) of Section 363 of the Code cover all possible uses of Bulldog's freight undercharge claims, which the Plaintiff/Appellant would otherwise "use" by collecting them and using the proceeds to pay creditors of the Bulldog estate. Section 2(a) of the NRA limits such use by retroactively precluding the Plaintiff/Appellee from collecting *any* of the amounts owed on those claims. Further, Section 363(*l*) of the Code nullifies applicable laws that cause *either* a "forfeiture, modification, *or* termination" of the debtor's interest in its property.

Thus, the Defendant/Appellant and the ICC incorrectly argued that Section 363(*l*) of the Code only barred total forfeitures of a debtor's property. Further, *even if* Sections 363(*l*) and 541(c)(1)(B) of the Code only barred outright forfeitures, they would still apply here as Section 2(a) of the NRA retroactively gives Defendant/Appellant a *total* defense to Plaintiff/Appellee's freight undercharge claims.

■■■ It is not proper to focus only on Section 541(c)(1)(B) of the Code to sustain an argument that Section 2(a) of the NRA could validly operate to limit Bulldog's property rights *after* Bulldog filed bankruptcy. Such an argument ignores the fact that Section 363(*l*) of the Code expressly protects a trust-

ee's right to use the debtor's property under Sections 363(b) and (c) of the Code during the *post*-bankruptcy filing period, "notwithstanding any provision in ... applicable law that is conditioned on the ... financial condition of the debtor[.]"

Some courts' confusion on this point has resulted from their misinterpretation of the legislative history of 11 U.S.C. § 363(*l*). The legislative history of Section 363(*l*) of the Code stated that it "was not as broad" as Section 541(c)(1) of the Code. However, this legislative history does *not* mean—as some courts believe—that Section 363(*l*) of the Code is mere statutory surplusage. On the contrary, Section 363(*l*) of the Code applies to the post-bankruptcy filing period, unlike Section 541(c)(1)(B). The statement in the legislative history on which some courts mistakenly relied merely reflects what is evident from comparing Section 363(*l*) of the Code with Section 541(c)(1) of the Code: that Section 363(*l*) does not contain a provision that parallels *subparagraph (1)(A)* of Section 541(c). *See In re Baquet,* 61 B.R. 495, 500 (Bankr.Mont.1986) (commenting that "notably absent from Section 363(*l*) is the language of Section 541(c)(1)(A)"). But Section 541(c)(1)(A) of the Code, unlike Section 541(c)(1)(B), has nothing to do with this Bulldog case.

The Defendant/Appellant and the ICC argue that Sections 363(*l*) and 541(c)(1) of the Code are irrelevant because neither provision creates property rights. From this proposition, they further argued that the NRA can validly modify Bulldog's claims to recover freight undercharges. For support, they cite *In re Farmers Markets, Inc.,* 792 F.2d 1400 (9th Cir.1986), which involved Section 541(c)(1)(A)—not Sections 541(c)(1)(B) or 363(*l*).

In *Farmers Markets,* the Ninth Circuit reviewed the ruling of a trial court that Section 541(c)(1)(A) of the Code invalidated "*any* provision in any agreement or law that restricts or conditions the transferability of a debtor's interests." *See In re Farmers Markets, Inc.,* 36 B.R. 829, 832 (Bankr.E.D.Cal. 1984), *reversed,* 792 F.2d 1400 (9th Cir.1986). In other words, the trial court had concluded that Section 541(c)(1)(A) of the Code invali-

dates *all* otherwise applicable restrictions on a debtor's transfer or use of its property, regardless of whether they are conditioned on the debtor's financial condition, insolvency, bankruptcy, or custodianship. In reversing the trial court's broad reading of Section 541(c)(1)(A), the Ninth Circuit explained that the trial court incorrectly read Section 541(c)(1)(A) "to invalidate upon the commencement of bankruptcy proceedings *all* transfer restrictions on property in which the debtor holds an interest." *Farmers Markets, supra,* 792 F.2d at 1402. The Ninth Circuit did not state or suggest that the property restriction in issue was conditioned on the debtor's financial condition, nor did the Ninth Circuit mention Sections 363(*l*) or 541(c)(1)(B) of the Code.

The property restriction at issue in *Farmers Markets* was not conditioned on the financial condition of the debtor. The restriction merely provided that the debtor could not transfer its liquor license without paying certain taxes, and the debtor challenged it only under Section 541(c)(1)(A) of the Code. Regardless of the financial condition of the debtor, it had to pay the taxes to transfer the liquor license. Neither Section 363(*l*) nor Section 541(c)(1)(B) had any application to that restriction.

There are additional problems with the contention of Defendant/Appellant and the ICC that *Farmers Markets* permits the NRA to condition a debtor's property rights on its financial condition:

*First*: If Defendant/Appellant and the ICC are correct, then Sections 363(*l*) and 541(c)(1)(B) of the Code would permit enforcement of laws or contract clauses that forfeit all of the assets of a debtor in the event that the debtor becomes financially troubled or insolvent. But that result conflicts with the language of Sections 363(*l*) and 541(c)(1)(B) of the Code, and would revive the antiquated and harsh rule that the Bankruptcy Code was enacted to prevent.

■ *Second*: Defendant/Appellant and the ICC rely upon an incomplete statement of the law. They emphasize that non-bankruptcy law defines whether a debtor has a property right. But they overlook that Sections 363(*l*) and 541(c)(1) of the Code expressly limit the enforceability of statutory and contractual restrictions on such property rights to the extent that such restrictions are conditioned on the financial condition, bankruptcy, insolvency, or custodianship of the debtor. In an effort to avoid this undeniable fact, the ICC cites such irrelevant cases as *In re Gull Air, Inc.,* 890 F.2d 1255 (1st Cir.1989) [14], in which the court did not address the protections of Sections 363(*l*) and 541(c)(1) of the Code. Other cases cited by the Defendant/Appellant and the ICC were similarly inapplicable. For example, *In re Polycorp Associates, Inc.,* 47 B.R. 671 (Bankr.N.D.Cal.1985) did not discuss whether the property restriction at issue was unenforceable by reason of being conditioned on the financial condition of the debtor. Similarly, *In re Gaslight Village, Inc.,* 6 B.R. 871, 875 (Bankr.D.Conn.1980) enforced a contractual restriction on the debtor's property only *after* concluding that the restriction was *not* conditioned on the debtor's financial condition.

■ *Third*: Defendant/Appellant and the ICC cannot justify the NRA's restrictions on freight undercharge claims by arguing that the NRA merely "adjusts the value" of those claims. This contention has three flaws: (a) it overlooks that Sections 363(*l*) and 541(c)(1)(B) of the Code invalidate financial condition-triggered restrictions that *modify* the debtor's property rights, even if no forfeiture or termination occurs; (b) Section 2(a) of the NRA forfeits 100% of Bulldog's freight undercharge claims against such "small business concerns"; and (c) Section 2(e) of the NRA invalidates 100% of Bulldog's *Maislin*-type freight undercharge claims.

*Fourth*: The facts do not square with the contention of Defendant/Appellant and the ICC that Sections 363(*l*) and 541(c)(1) of the Code are inapplicable on the theory that the

---

**14.** The *Gull Air* case involved the right of an airline to landing slots. In 1992, special amendments to the Bankruptcy Code were enacted to deal with landing slot rights. *See* 4 L. King, *Collier on Bankruptcy* ¶ 365.05(3). In contrast, the proponents of the NRA deliberately and knowingly avoided seeking any amendment to the Bankruptcy Code.

NRA merely defines the extent to which Bulldog's freight undercharge claims become a part of Bulldog's estate. The facts are that Bulldog's freight undercharge claims vested in Bulldog's bankruptcy estate in 1990, approximately three years before the enactment of the NRA. The NRA operates to remove, forfeit and modify freight undercharge claims that were previously judicially determined to belong to the Bulldog estate. *See Cooper, Trustee v. Interstate Commerce Commission,* 150 B.R. 912.

■ Congress can modify or repeal the filed rate doctrine embodied in the ICA, which it has recently done, so long as it does not retroactively repeal vested rights in violation of the Fifth and Fourteenth Amendments to the United States Constitution. However, pursuant to Sections 541(c)(1) and 363(*l*) of the Code, Congress cannot condition the application of its amendments to the ICA on the financial condition of a motor carrier which is a debtor under the Bankruptcy Code unless it amends the Bankruptcy Code. Instead, Congress has specifically provided in Section 9 of the NRA that the NRA does not amend the Bankruptcy Code. Consequently, the NRA does not operate to remove, forfeit or modify the freight undercharge claims that are part of the bankruptcy estate of Bulldog.

■ Under Sections 541 and 363 of the Code the freight undercharge claims of Bulldog became and continue to be property of its bankruptcy estate which the Plaintiff/Appellee may use, and the NRA is ineffective to prevent these claims from becoming and remaining property of the estate. Any attempt by the Defendant/Appellant to utilize the provisions of Section 2 of the NRA would exercise control over the estate's freight undercharge claims, and would violate the automatic stay of 11 U.S.C. § 362(a)(3). Section 9 of the NRA expressly provides that Title 11 is not amended, so Section 362 retains its vitality. Section 362(a)(3) provides:

(a) Except as provided in subsection (b) of this section, a [voluntary or involuntary bankruptcy] petition ... operates as a stay, applicable to all entities, of—

(3) any act to obtain possession of property of the estate or of property from the estate *or to exercise control over property of the estate[.]* (Emphasis added.)

Subsection 362(b) contains two narrow [15] exceptions to the automatic stay for certain governmental regulatory actions. But those provisions by their express terms *only* create exceptions to the stay of § 362(a)(1) and (2)—*not* (a)(3).

Section 362(a)(3) of the Code, therefore prevents any entity—including the ICC or the Defendant/Appellant—from invoking the provisions of Section 2 of the NRA against the Plaintiff/Appellee to control property of the estate.

■ The cardinal canon of statutory construction is that courts "must presume that a legislature says in a statute what it means and means what it says there." *Connecticut National Bank v. Germain,* 503 U.S. ——, ——, 112 S.Ct. 1146, 1149, 117 L.Ed.2d 391 (1992). In construing statues court must "avoid conflicts between two statutory regimes ... that in some respect overlap." *Pittsburgh & Lake Erie R. Co. v. Ry. Labor Executives' Ass'n.,* 491 U.S. 490, 510, 109 S.Ct. 2584, 2596, 105 L.Ed.2d 415 (1989). Courts may not "pick and choose among congressional enactments, and when two statutes are capable of coexistence, it is the duty of the courts, absent a clearly expressed congressional intention to the contrary, to regard each as effective." *Id.* (quoting *Morton v. Mancari,* 417 U.S. 535, 551, 94 S.Ct. 2474, 2483, 41 L.Ed.2d 290 (1974) (internal quotation marks omitted)). In construing two statutes the court must preserve their sense and purpose while giving effect to each. *Id.* at 510, 109 S.Ct. at 2596.

The Bankruptcy Court was confronted in this case with a flawed statute which was the product of two inconsistent aims: to (i) effectively strip financially distressed nonoperating motor carriers of the right to collect on freight undercharge claims which are proper-

---

**15.** The House and Senate sponsors of the Bankruptcy Code both stated that § 362(b)(4) "is intended to be given a narrow construction...." 1978 U.S.C.C.A.N. 6444 (floor statement by Rep. Don Edwards); 1978 U.S.C.C.A.N. 6513 (floor statement of Senator Dennis DeConcini).

ty of them or their respective bankruptcy estates; and (ii) to prevent the amendment of the Bankruptcy Code which prohibits Congress from stripping away the freight undercharge claims of bankrupt motor carriers based on their financial condition. The Bankruptcy Court performed this difficult task in the only way available to it. The Bankruptcy court gave effect to each section of the statutes involved construing the sections of the NRA in conflict with the Bankruptcy Code to apply to non-bankrupt motor carriers and preserving the integrity of the Bankruptcy Code as directed by Section 9 of the NRA.

Contrary to the assertions of the Defendant/Appellant, the Bankruptcy Court's ruling does not render the NRA a nullity or any portion of the NRA superfluous. Sections 1 and 3 through 9 of the NRA are left undisturbed by the Bankruptcy Court's ruling. Section 2 continues to apply to nonoperating motor carriers which have not sought protection under Chapter 7 of the Bankruptcy Code or which have continued to operate under Chapter 11 of the Code. The NRA contains numerous provisions dealing with secret coded tariffs, range tariffs, off-bill discounting and enforcement of the distinction between common and contract carriers. The NRA remains an effective law. Only those provisions which conflict with and are overridden by, the Bankruptcy Code are affected by the Bankruptcy Court's ruling.

Section 9 of the NRA provides that "nothing in [the NRA] (including any amendment made by [the NRA]) shall be construed as limiting or otherwise affecting [the] application of Title 11, United States Code, relating to bankruptcy. ...." This language clearly shows that Congress did not intend for the NRA to silently limit Sections 363($l$) and 541(c)(1) of the Bankruptcy Code. "Absent a *clear* congressional statement, pre-existing statutory or common law rights or defenses are *not* displaced by federal enactment." *F.D.I.C. v. McSweeney*, 976 F.2d 532, 538 (9th Cir.1992) *cert. denied,* —— U.S. ——, 113 S.Ct. 2440, 124 L.Ed.2d 658 (1993) (emphasis added). Congress in Section 9 of the NRA has clearly mandated that the pre-existing statutory rights and defenses of bankruptcy

estates embodied in the Bankruptcy Code shall not be affected by the NRA's provisions. The Bankruptcy Court has simply taken Congress at its word and applied the NRA as enacted. *See Connecticut National Bank v. Germain, supra.*

As the Defendant/Appellant has pointed out, certain members of the Senate Committee on Commerce, Science and Transportation and the House Committee on Public Works and Transportation along with the Commissioners of the ICC and representatives of the shippers facing freight undercharge claims, were passionately against bankruptcy trustees bringing freight undercharge claims on behalf of their bankruptcy estates. However, the Defendant/Appellant in its attack on the interpretation of the NRA by the Bankruptcy Court, gives no weight to that portion of the legislative history at odds with its interpretation. The House Judiciary Committee, which is the only legislative committee in the House that had jurisdiction to determine whether the Bankruptcy Code should be amended to prevent it from invalidating portions of the NRA, requested in November of 1993 that H.R. 2121 (the bill which became the NRA) be referred for review by the Judiciary Committee. In requesting the referral by letter on November 10, 1993, Chairman Jack Brooks explained:

> The Committee on the Judiciary has had no opportunity whatsoever to review [H.R. 2121] and consider its impact on the bankruptcy system, administrative law and the jurisdiction of the Federal Courts. Such an opportunity is essential if the Committee is to carry out its mandate to ensure the integrity and consistency of the Code in these areas of the law.

Five days later Representative Norman Mineta, a principal sponsor of H.R. 2121 and the Chair of the House Committee on Public Works and Transportation wrote to Chairman Brooks to confirm their agreement on language clarifying that the legislation would not affect the Bankruptcy Code or the jurisdiction of the bankruptcy courts. This letter was included in the November 15, 1993, report on H.R. 2121 by the House Committee on Public Works and Transportation. H.R.Rep. No. 359, 103d Cong., 1st Sess. at

16–17, U.S.Code Cong. & Admin.News 1993, at 2543–2544.

On November 15, 1993, the House Committee on Public Works and Transportation reported an amended H.R. 2121 which contained a new Section 9 providing that nothing in the NRA would affect the applicability of Title 11 relating to bankruptcy. *See generally, Id.* On that same day Section 9 of H.R. 2121 was amended to its present form providing that nothing in the NRA would be construed to limit or otherwise affect the application of Title 11, United States Code, relating to the jurisdiction of the courts of the United States including the bankruptcy court. *See* 139 Cong.Rec. H 9593–9596. In addition, on November 15, 1993, Congressman Mineta on the floor of the House stated that H.R. 2121 as amended was not intended to affect either the Bankruptcy Code or the jurisdiction of the bankruptcy courts, matters over which his committee had no jurisdiction. *Id.* at 9603.

This final statement on the matter by Congressman Mineta and the enactment of H.R. 2121 as amended by the *full* Congress is the best indication of the intent of Congress when it passed the NRA. The Bankruptcy Code and the jurisdiction of the Federal Courts was left intact and unchanged. Sections 541(c)(1) and 363(*l*) of the Bankruptcy Code retain their full vitality and their operation is not in any way impaired or amended by the NRA. Consequently, the Bankruptcy Court did the only thing it could when it construed the NRA to be limited by Sections 541(c)(1) and 363(*l*) of the Bankruptcy Code. Any other interpretation would have been a violation of the expressed intent of Congress when it enacted the amended H.R. 2121 into law as the NRA.

The Defendant–Appellant has implied that the ruling of the Bankruptcy Court creates an absurdity and wishes for the Court to rewrite the NRA to create a *pro tanto* amendment to the Bankruptcy Code allowing Section 2 of the NRA to override Sections 363(*l*) and 541(c)(1) of the Code. The "absurdity" exception that allows courts to rewrite statutes does not apply when the language of the statute is as compellingly clear as Section 9 of the NRA. *Potomac Electric*

*Power Co. v. Director,* OWCP, 449 U.S. 268, 284–85, 101 S.Ct. 509, 517–18, 66 L.Ed.2d 446 (1980) (when a statute has "compelling" language that produces "incongruities," then "the federal courts may not avoid them by rewriting or ignoring that language"); *TVA v. Hill,* 437 U.S. 153, 194 n. 33, 98 S.Ct. 2279, 2298 n. 33, 57 L.Ed.2d 117 (1978) ("absurdity" exception only applies in "rare and exceptional circumstances" and "there must be something to make plain the intent of Congress that the letter of the statute is not to prevail"), *quoting Crooks v. Harrelson,* 282 U.S. 55, 60, 51 S.Ct. 49, 50, 75 L.Ed. 156 (1930). Here, the legislative history of Section 9 of the NRA is "compelling" and confirms unequivocally that Congress intended to say what Section 9 of the NRA plainly does say: that it does *not* amend Title 11.

11 U.S.C. §§ 363(*l*) and 541(c)(1) by their express terms contemplate that those provisions can and will invalidate an otherwise "applicable law" (Section 363(*l*)) or "applicable nonbankruptcy law" (Section 541(c)(1)) that seeks to modify the property rights of a debtor based on its financial condition. In enacting Sections 363(*l*) and 541(c)(1) of the Code, Congress plainly understood that ill-advised legislators would occasionally enact laws that discriminated against debtors based on their financial condition, and further decided that such ill-advised laws should and would be unenforceable in bankruptcy cases.

Defendant/Appellant's claim of "absurdity" is really an attack on the anti-forfeiture and anti-discrimination policies embodied in 11 U.S.C. §§ 363(*l*) and 541(c)(1). If those statutes are "absurd" and "irrational," the remedy is to petition Congress, not this Court. The proponents of the NRA disregarded this remedy in 1993 when they circumvented the Judiciary Committee. Under Rule X of the House of Representatives, the Judiciary Committee was and is the only committee that had jurisdiction to determine whether the Bankruptcy Code should be amended to prevent it from invalidating portions of the NRA. This Court should not rewrite 11 U.S.C. §§ 363(*l*) and 541(c)(1) merely because the proponents of the NRA evaded

**570**

hearings before the House Judiciary Committee.

Defendant/Appellant and the ICC argue that this Court should invoke the "purpose" of Section 2 of the NRA as a basis for overriding the terms of both Section 9 of the NRA and 11 U.S.C. §§ 363(*l*) and 541(c)(1)(B). However, this disregards the 1988–1993 jurisdictional battle between the Public Works Committee and the Judiciary Committee that resulted in the enactment of a compromise version of the NRA that did *not* alter the Bankruptcy Code.

> Application of the "broad purposes" of legislation at the expense of specific statutory provisions ignores the complexity of the problems Congress is called upon to address and the dynamics of legislative action.... [T]he final language of the legislation may reflect hard-fought compromises. Invocation of the "plain purpose" of legislation at the expense of the terms of the statute itself takes no account of the processes of compromise and, in the end, prevents the effectuation of Congressional intent.

*Federal Reserve Board v. Dimension Financial Corp.,* 474 U.S. 361, 373–74, 106 S.Ct. 681, 688–89, 88 L.Ed.2d 691 (1986).

This Court concludes that the Bankruptcy Court was correct. It is therefore,

**ORDERED,** Sections 2(a)–(c) and (e)–(g) of the NRA are ineffective and unenforceable against the Plaintiff/Appellee and the Bulldog bankruptcy estate by reason of 11 U.S.C. §§ 541(c)(1) and 363(*l*), and by reason of 11 U.S.C. § 362(a)(3).

**IT IS FURTHER ORDERED** that the Order and Memorandum Decision of the Bankruptcy Court denying the Defendant–Appellant's Motion to Amend Order of Referral, be, and it is hereby, affirmed in all respects.