**JONES TRUCK LINES, INC., Plaintiff,**

v.

**PRICE RUBBER CORPORATION,
Defendant.**

Civ. A. No. 93–A–933–N.

United States District Court,
M.D. Alabama,
Northern Division.

June 2, 1995.

William M. Halcomb, Rodney E. Nolen, Birmingham, AL, for plaintiff.

J. Fairley McDonald, Montgomery, AL, for defendant.

## MEMORANDUM OPINION

ALBRITTON, District Judge.

### INTRODUCTION

This cause is before the court on the Plaintiff's Motion for Summary Judgment, filed on November 12, 1993. The defendant has responded to plaintiff's arguments, and both sides have submitted cases from other jurisdictions that support their positions.

The plaintiff originally brought suit in the Circuit Court of Montgomery County, Alabama. Defendant removed the action to this court pursuant to the court's federal question jurisdiction as set forth in 28 U.S.C. § 1441(a) and 28 U.S.C. § 1331. The court finds that jurisdiction is proper as this case arises under the laws of the United States, specifically the Interstate Commerce Act, 49 U.S.C. § 10101 *et seq.*

Plaintiff, Jones Truck Lines, Inc. ("Jones"), seeks recovery of freight "undercharges" from the defendant. Plaintiff, a motor carrier which filed for bankruptcy pursuant to Chapter 7, in 1991 or 1992 (case number 91–15475–M in the Western District of Arkansas) seeks this recovery pursuant to the "filed rates doctrine." According to the plaintiff, it is entitled to recover the difference between the shipping rate on file with the Interstate Commerce Commission (ICC) and the rate actually charged the defendant, the "negotiated rate."

The defendant counters that the Negotiated Rates Act of 1993 ("NRA") eliminates the plaintiff's right to recover the undercharge and gives the defendant several options in a matter such as this. Defendant contends that under the NRA it may pay a percentage of the claimed amount; or the defendant may submit the issue to the ICC for a determination of whether they may be entitled to a complete defense based on plaintiff's "unreasonable practices;" or it may seek a determination by the ICC as to the reasonableness of the rate charged.

Plaintiff counters that the NRA should not or cannot be applied to cases such as the instant case. Plaintiff bases this assertion on three separate grounds. First, plaintiff argues that Section Nine of the NRA exempts carriers in bankruptcy from the application of the NRA. Second, and related to first argument, plaintiff contends that the anti-forfeiture provisions of the Bankruptcy Code prevent application of the NRA to carriers in bankruptcy. Finally, plaintiff contends that the NRA, as applied in an instance such as this, is unconstitutional. Plaintiff alleges that to apply the NRA would constitute a taking in violation of the Fifth Amendment. Additionally, plaintiff argues that the NRA violates the constitutional principle of separation of powers. Finally, the plaintiff asserts that the NRA violates the Fourteenth Amendment's equal protection clause.

For the reasons set forth below, the court finds that the Negotiated Rates Act of 1993 does apply to this case, and that the defendant therefore has the choice of the remedies prescribed by the Act. Under the doctrine

of primary jurisdiction, this court has the option to refer this matter to the ICC for a determination of the issues. Because the agency has a particular expertise in these issues, the court will exercise this option and refer this matter to the ICC. The Plaintiff's claims are therefore due to be DISMISSED.

## BACKGROUND

This case is the residue of a tumultuous and uncertain era in the shipping business. The facts and circumstances in this litigation are hardly unique. In fact, cases such as this with identical or nearly identical facts have been decided by, or are pending before, federal judges across the country. Although Congress recently attempted through legislation to simplify and clarify the issues and the law in this area, unfortunately it does not appear to have succeeded. Therefore, it is left to the courts to resolve the remaining controversy. To fully appreciate the issues in this case, some background is helpful.

The Interstate Commerce Act ("ICA") requires carriers of cargo in interstate commerce to file their shipping rates with the ICC. 49 U.S.C. § 10101 *et seq.* The carriers are not permitted to charge a shipper a rate other than that on file with the ICC. 49 U.S.C. § 10761(a). Failure to comply with this rule can result in both civil and criminal penalties. *Security Services, Inc. v. Kmart Corporation,* —— U.S. ——, ——, 114 S.Ct. 1702, 1706, 128 L.Ed.2d 433 (1994). This policy is referred to as the "filed rate doctrine," and it has been an integral part of the shipping industry since the earliest days of the ICA. *See, Louisville and Nashville R. Co. v. Maxwell,* 237 U.S. 94, 97, 35 S.Ct. 494, 495, 59 L.Ed. 853 (1915) ("Under the Interstate Commerce Act, the rate of the carrier duly filed is the only lawful charge.").

In 1980, the Motor Carrier Act ("MCA") partially deregulated the trucking industry. P.L. 96–296, 94 Stat. 793 (1980). Additionally, during the 1980's, the ICC vigorously pursued a policy of deregulation. *Maislin Industries, U.S., Inc. v. Primary Steel, Inc.,* 497 U.S. 116, 133, 110 S.Ct. 2759, 2769–70,

111 L.Ed.2d 94 (1990). In line with this policy and because of the competition created by it, truckers often discounted their filed rates, charging shippers less. In many instances, the carrier did not re-file the discounted rates. The result was a violation of the ICA, in that carriers were charging a rate other than that on file.

Lawsuits arose in this context when carriers began to go out of business as a result of the fierce competition generated by the ICC's deregulation policies. Typically, following a bankruptcy filing by a carrier and the appointment of a trustee, the trustee hired auditors to pore over the defunct company's ledgers. Quite often, the auditors discovered numerous undercharges made by the carriers. According to the filed rates doctrine, the trustee was entitled to bring an action against the shipper for the amount of the undercharge. In fact, under the fiduciary duties of the trustee, the trustee was *required* to bring such actions, in order to maximize the debtor's estate.

So, for example, where a manufacturer had several years earlier shipped goods across the country and had paid the negotiated rate of $1.00 per pound, that manufacturer now found itself being sued to recover an additional amount based on the higher filed rate. This lawsuit could be brought several years after the shipper had fully paid the bill sent by the carrier.

In response to such suits, the ICC formulated a defense called the "unreasonable practices defense."[1] This policy allowed shippers to avoid the undercharge claim by asserting that subsequent attempts to enforce a filed rate over a negotiated rate was an unreasonable practice. Shippers that reasonably relied on the rate that they were quoted by a carrier were therefore protected from later claims by the now bankrupt carrier. No fewer than five Federal Courts of Appeals upheld the ICC's unreasonable practice defense. *See, Delta Traffic Service, Inc. v. Transtop, Inc.,* 902 F.2d 101 (1st Cir.1990); *Orscheln Bros. Truck Lines, Inc. v. Zenith*

---

1. The unreasonable practices defense actually already existed under the ICA. More accurately, then, the ICC redefined the unreasonable practices defense to include situations where bankrupt carriers attempted to recover undercharges.

*Electric Corp.*, 899 F.2d 642 (7th Cir.1990); *West Coast Truck Lines, Inc. v. Weyerhaeuser, Co.*, 893 F.2d 1016 (9th Cir.1990); *Delta Traffic Service & Oneida Motor Freight, Inc. v. Appco Paper & Plastics Corp.*, 893 F.2d 472 (2nd Cir.1990).[2]

In 1990, however, the Supreme Court invalidated those Circuit Courts' interpretation of the law and re-energized bankruptcy trustees and the undercharge litigation crises. *Maislin*, 497 U.S. 116, 110 S.Ct. at 2760–61. In *Maislin*, the Court ruled that the ICC had overstepped its authority in promulgating and enforcing the unreasonable practices defense. *Maislin*, 497 U.S. at 134–35, 110 S.Ct. at 2770–71. Additionally, the Court held that the defense as applied to the bankrupt carriers' suits to recover undercharges was contrary to the ICA and the filed rates doctrine. *Maislin*, 497 U.S. at 130, 110 S.Ct. at 2767–68. Allowing the unreasonable practices defense essentially gutted the rationale for filing rates with the ICC, which was, according to the Court, "to ensure that rates are both reasonable and non-discriminatory." *Maislin*, 497 U.S. at 119, 110 S.Ct. at 2762. The Court noted that if Congress determined that this defense ought to be allowed, or if it determined that the filed rate doctrine had outlived its purpose, then it had the authority and ability to alter the law. *Maislin*, 497 U.S. at 135–36, 110 S.Ct. at 2770–71. Under our Constitutional framework, however, such decisions were not properly made by the ICC or by the Court. *Maislin*, 497 U.S. at 136, 110 S.Ct. at 2771 (Scalia, J., concurring).

As stated above, the result of the *Maislin* decision was a new round of undercharge lawsuits. Another result was that Congress accepted the invitation of the Supreme Court and began working on legislation to resolve the issue. After several unsuccessful attempts, this legislation became law in 1993 as the Negotiated Rates Act.

**2.** In contrast, only one Circuit Court held that the ICC's practice was invalid. *In re Caravan Refrigerated Cargo, Inc.*, 864 F.2d 388 (5th Cir. 1989).

**3.** There is no dispute as to Jones' status in this case. According to the defendant, Jones is "no longer transporting property." *See* Defendant's

## THE NEGOTIATED RATES ACT

On December 3, 1993, President Clinton signed into law the Negotiated Rates Act of 1993. P.L. 103–180, 107 Stat. 2044 (1993), now codified at 49 U.S.C. § 10701(f). The Act amended certain sections of the Interstate Commerce Act in direct response to the Supreme Court's decision in *Maislin*. House Report 103–359, Reprinted in 1993 U.S.S.C.A.N. 2534, 2535. *See, also, Jones Truck Lines, Inc. v. AFCO Steel*, 849 F.Supp. 1296, 1302 (E.D.Ark.1994). In particular, the legislative history clearly indicates a desire on the part of the legislature to alleviate the undercharge crises and reinstate the unreasonable practices defense. House Report 103–359, Reprinted in 1993 U.S.S.C.A.N. 2534, 2535. The Act provides shippers being sued for undercharges with three options.

First, upon proof of several preliminary issues, the shipper has the option to settle the undercharges claim for a percentage of the claim. Subsection (A) mandates that the shipper must show that the carrier "is no longer transporting property, or is transporting property solely for the purpose of avoiding the application of this subsection ... " 49 U.S.C. § 10701(f)(1)(A). Disputes regarding the carrier's status are to be resolved by the court in which an action is filed.[3] 49 U.S.C. § 10701(f)(1).

Additionally, pursuant to subsection (B), the shipper must show that it was offered a rate other than the filed rate, that it tendered the freight to the carrier in reliance of that rate, that the carrier did not promptly file that rate, and that the rate was billed and collected by the carrier. If the carrier then demands a higher rate than the negotiated rate, then certain remedies become available to the shipper.[4] 49 U.S.C. § 10701(f)(1)(B)(i–v). One of these remedies is the option to settle the claim for a percentage of the undercharge. 40 U.S.C. § 10701(f)(2–4). If the shipper elects to settle, the carrier is

Response and Memorandum in Opposition to Summary Judgment, filed on December 15, 1993, at page 12. The plaintiff has not at any point argued that it is in fact still in operation.

**4.** Disputes regarding these factors are to be resolved by the ICC. 49 U.S.C. § 10701(f)(1).

bound by the decision. 49 U.S.C. § 10701(f)(1). Additionally, the Act completely exempts from undercharge claims small businesses, charities and transporters of recycled goods. 49 U.S.C. § 10701(f)(9).

The second option that the NRA gives a shipper is the right to ask for a determination by the ICC of the reasonableness of the rate. 49 U.S.C. § 10701(f)(6). Finally, the NRA also revitalizes the unreasonable practice defense and allows a shipper to assert this defense before the ICC. 49 U.S.C. § 10701, Note on Alternative Procedure for Resolving Disputes; *see also,* P.L. 103–180 § 2(e)(1), 107 Stat. 2044, 2047. The NRA makes it an unreasonable practice to attempt to collect a rate higher than the negotiated for rate on services that were provided prior to September 30, 1990. *Id.* The Act specifically grants jurisdiction over the issue of unreasonable practices to the ICC. 49 U.S.C. § 10701, Note on Alternative Procedure for Resolving Disputes; *see also,* P.L. 103–180 § 2(e)(2), 107 Stat. 2044, 2047–48.

The difficulty with the NRA has been its applicability to carriers in bankruptcy. Trustees, such as the plaintiff in this case, have challenged the NRA on several grounds.

### ANALYSIS

*A. Does Section 9 of the NRA Exempt Bankrupt Carriers from Application of the NRA?*

■ In the years prior to the passage and enactment of the Negotiated Rates Act, several similar pieces of legislation had been proposed and discussed by members of Congress. *See E.I. DuPont v. Cooper,* 173 B.R. 550, 556 (W.D.N.C.1994). In those cases, then Chairman of the House Judiciary Committee Jack Brooks (Tex.) had frustrated the bills' proponents by requesting referral to his Committee based on the bills' effects on bankruptcy law, a subject within the Judiciary Committee's jurisdiction. *Id.* These bills did not make it out of committee. The sponsors of the 1993 legislation, apparently in an effort to avoid a referral to Brooks' Committee, added a limiting provision to the NRA.

*Id.* at 557. Added as section 9, the language is as follows:

> SEC. 9. LIMITATION ON STATUTORY CONSTRUCTION. Nothing in this Act (including any amendment made by this Act) shall be construed as limiting or otherwise affecting application of title 11, United States Code, relating to bankruptcy; title 28, United States Code, relating to the jurisdiction of the courts of the United States (including bankruptcy courts); or the Employee Retirement Income Security Act of 1974.

> P.L. 103–180, 107 Stat. 2044

One of the issues for resolution, then, is whether or not this section prevents the application of the NRA to carriers in bankruptcy. The language of the NRA itself was not entirely clear in expressing Congress' intent. However, following a review of the language of the Act, the legislative history of the Act and the relevant case law, it is clear to the court that the NRA was in fact intended to apply to carriers in bankruptcy.

■ As many other courts have held, Congress passed the NRA to ameliorate the effect of undercharge claims on businesses around the country. *See, AFCO Steel,* 849 F.Supp. at 1299–1300. The legislative history of the Act is clear on this point. Many of the statements made by Members of Congress on the floor during debate on the Act refer to the problem of undercharge litigation by bankruptcy trustees and the effect that the NRA would have in alleviating this problem. *See, Id.* for an extensive discussion of the legislative history of the NRA. To hold that Section Nine completely erases the obvious intent of the entire rest of the NRA would produce an absurd result, and would limit the application of the Act to situations where a carrier has ceased operations, but has not filed for bankruptcy. Obviously these few cases were not foremost in Congress' mind when it passed the NRA. True, these cases are covered under the Act, but it is clear that the Act was also designed to deal with the millions, if not billions of dollars in undercharge claims brought by bankrupt-

cy trustees.[5] The court cannot hold that this one section (Section Nine) of the Act was intended to cancel out the obvious intent of all that is written before it. *See, Jones Truck Lines, Inc. v. Polyflex Film & Converting, Inc.*, 173 B.R. 576, 579 (S.D.Miss. 1994). When possible, the court enforces the plain language of a statute, except where doing so would produce an absurd result. *See, U.S. v. Ron Pair Ent., Inc.*, 489 U.S. 235, 109 S.Ct. 1026, 103 L.Ed.2d 290 (1989); *U.S. v. McLymont*, 45 F.3d 400, 401 (11th Cir.); *cert. denied*, —— U.S. ——, 115 S.Ct. 1723, 131 L.Ed.2d 581 (1995) ("[T]he plain meaning of the statute controls unless the language is ambiguous or leads to absurd results."); *U.S. v. Real Estate at 6640 SW 48 St.*, 41 F.3d 1448, 1452 (11th Cir.1995). Such is the case here, and accordingly the court will follow the clear intent of Congress and hold that Section Nine does not exempt carriers in bankruptcy from the remaining provisions of the NRA.[6]

Additionally, there is a more reasonable interpretation of Section Nine. Based on the statements of Congressman Mineta, the Chairman of the Public Works and Transportation Committee, the committee that reported the NRA, it seems that Section Nine was intended to clarify that the NRA was not intended to amend the bankruptcy code, nor was it intended to alter the jurisdiction of the bankruptcy courts or the district courts. *Jones Truck Lines, Inc. v. AFCO Steel*, 849 F.Supp. 1296, 1299–1300 (E.D.Ark.1994). Previous versions of the NRA had attempted to work both results, which caused the death of the bills in Congressman Brooks' committee. *See*, Johnson, Wayne, *The Negotiated Rates Act of 1993: Congress Curtails Undercharge Litigation in Bankruptcy by Amending the Filed Rate Doctrine*, 68 **Am.Bankr. L.J.** 319, n. 427 and accompanying text. Section Nine appears to be a compromise between Mineta and Brooks that leaves the

code and the jurisdiction of the courts unaffected, rather than a provision designed to exempt bankrupt companies from the remedies contemplated by the Act.

*B. Does Section 9, Coupled with the Anti-Forfeiture Provisions of the Bankruptcy Code Prevent the Application of the Remedies Provided by the NRA to Carriers in Bankruptcy?*

The possible effect of Section Nine of the NRA therefore has two analyses. The first is whether or not Congress intended the NRA to apply to bankrupt carriers at all, which the court has resolved in the affirmative. The second is whether Section Nine directs the court to prevent application of the NRA to bankrupts if the NRA violates the anti-forfeiture provisions of the bankruptcy code. As stated above, the court is of the opinion that Section Nine leaves the bankruptcy code unaffected—meaning that the NRA does not supersede the bankruptcy code. It is possible that if the provisions of the NRA violate the code those provisions ought not be applied. This second issue necessitates an examination of the anti-forfeiture provisions of the bankruptcy code, in particular 11 U.S.C. § 541(c)(1).

That section prevents otherwise applicable non-bankruptcy law from working a forfeiture of the debtor's property because of that debtor's insolvency or financial condition. In order for § 541(c)(1) to apply, the plaintiff must show three elements. First, the law must be a provision of non-bankruptcy law. Second, it must be conditioned on the bankruptcy or financial condition of the debtor. Finally, the law must effect or give the option to effect a forfeiture, modification, or termination of the debtor's interest in property. 11 U.S.C. § 541(c)(1). Although it seems likely that the NRA satisfies the first and third conditions, the court does not ac-

---

**5.** According to the House Report accompanying the NRA, "[e]stimates of amounts involved range from $200 million in 1990 to several billion dollars today with the ICC estimate at $32 billion." House Report 103–359, Reprinted at 1993 U.S.S.C.A.N. 2534, 2535.

**6.** The court notes that in interpreting a statute, the court should look to the plain language of the

law first. Under the plain language of the rest of the Act, the NRA applies to a carrier that is no longer carrying cargo. If that carrier is in bankruptcy, then the plain language clearly makes the NRA applicable to a bankrupt carrier that is no longer carrying cargo. Section Nine, on the other hand, is at best ambiguous, and at worst directly contrary to the rest of the Act.

cept plaintiff's argument that the NRA is conditioned on the insolvency or financial condition of the debtor.[7]

As detailed above, the NRA provides certain remedies to shippers provided they make several preliminary showings. Among these is the showing that the carrier is "no longer transporting property." The Act does not state that in order to be applicable the claimant must be bankrupt, or that any other financial condition triggers the provisions of the NRA.[8]

The language of the NRA is clear. In situations such as the instant case, it only applies to carriers which are no longer transporting property or those which are transporting property in order to avoid the application of the NRA. The law, therefore, has no impact on a bankrupt carrier operating under the protection of Chapter 11 as long as that carrier is still transporting property. Additionally, a carrier that is not bankrupt but has ceased transporting would come under the provisions of the NRA. In other situations, involving small businesses, charities and shippers of recycled goods, the operating status of the carrier is not even considered, indicating that Congress was not solely concerned with eliminating the claims of bankrupts. Although this was certainly a primary target of the legislation, the plain language of the statute counters plaintiff's argument that this law is conditioned on the financial status of the carrier.

This is fully in line with the intent and purpose of the NRA. Congress sought to eliminate the claims of carriers no longer operating because those claims were the most likely to result in litigation rather than settlement. Carriers that are still in operation pose less danger of undercharge claims

because they need to maintain relationships with their customers. A carrier that no longer needs to curry favor with its customers is more likely to assert the claims and less likely to be flexible. Additionally, the rationale for the filed rates doctrine, to prevent discriminatory pricing by carriers, is no longer applicable once a carrier is no longer in operation. *See,* Johnson, Wayne, *The Negotiated Rates Act of 1993: Congress Curtails Undercharge Litigation in Bankruptcy by Amending the Filed Rate Doctrine,* 68 **Am. Bankr.L.J.** 319, n. 440 and accompanying text.

Congress also made the determination that it was unfair for businesses to be subjected, often years later, to claims for charges by no longer existing carriers. *See, AFCO Steel,* 849 F.Supp. at 1301 (quoting statements of Senator Danforth, a leading sponsor of the NRA). The effect of this practice on those businesses was similar to a bait and switch. They were duped into shipping with one company based on the rate quoted to them, only to learn later that the company could quote that rate, receive payment, and later return to raise that price ex post facto.

## C. *Does the NRA Violate the Constitution?*

■ The court pauses for a moment to speak generally about the NRA and its constitutionality. Plaintiff has raised three separate grounds for declaring the law unconstitutional, and has raised cogent arguments in support of those points. However, the court notes that it has a duty in examining the constitutionality of a democratically passed law to save that law from constitutional defects if possible. *See, e.g., U.S. v. X–Citement Video, Inc.,* —— U.S. ——, ——, 115 S.Ct. 464, 472, 130 L.Ed.2d 372 (1994); *Chap-*

---

7. The Act is obviously otherwise applicable non-bankruptcy law. Additionally, given that the right to assert undercharge claims is a property right of the bankruptcy estate, the legislation seems to work a modification or a partial forfeiture of that right, or at least work a modification of the value of that right. The court notes, however, that defendant has advanced several persuasive arguments that the NRA does not satisfy the third prong of § 541(c)(1).

8. The court is aware of one decision that held that "no longer transporting property" was a

"financial condition." *Jones Truck Lines, Inc. v. IXL Manufacturing Co., Inc.,* 172 B.R. 602, 612–13 (Bankr.W.D.Ark.1994). All other cases that have discussed this issue have reached the opposite conclusion. *See, e.g., Jones Truck Lines, Inc. v. Republic Tobacco, Inc.,* 178 B.R. 999 (Bankr. N.D.Ill.1995); *Jones Truck Lines, Inc. v. Grinnell Corp.,* 167 B.R. 488, 493 (Bankr.N.D.Ill.1994); *Jones Truck Lines, Inc. v. Whittier Wood Products,* 1994 WL 525534, Civ. No. 94–5071 (W.D.Ark. July 18, 1994).

*man v. U.S.,* 500 U.S. 453, 464, 111 S.Ct. 1919, 1926–27, 114 L.Ed.2d 524 (1991). This principle is especially true in the area of interstate commerce. Unlike many other areas currently legislated by the federal government, interstate commerce is uniquely within the province of federal control. The Constitution specifically provides that this area is for federal control. U.S. Const., Article I, Section 8. Although the commerce clause recently may have been pruned back from its previously all-encompassing scope,[9] this particular area is one on which there can be no question. Thus, although the court must generally be careful in overturning a law passed by our elected representatives, this is especially true in this instance.

### 1. Does the NRA constitute a taking prohibited by the Fifth Amendment?

■ The Fifth Amendment to the Constitution specifically prohibits the federal government from taking private property for public use without "just compensation." U.S. Const. amend. V. The prohibition is designed to prevent the government from arbitrarily redistributing wealth, essentially forcing some people to bear public burdens that ought to be shared by all. *See, e.g., Dolan v. City of Tigard,* —— U.S. ——, ——, 114 S.Ct. 2309, 2316, 129 L.Ed.2d 304 (1994). The takings clause has been applied to situations where a government regulation, though not physically depriving a person of property, changes the circumstances such that a taking has occurred. *See, Id.; see also, Lucas v. South Carolina Coastal Council,* —— U.S. ——, ——, 112 S.Ct. 2886, 2893–94, 120 L.Ed.2d 798 (1992).

■ There are several factors which a court must examine in determining whether or not a government action constitutes a taking. One of these factors is the character of the government action. *Penn Central Transportation Co. v. City of New York,* 438 U.S. 104, 123–24, 98 S.Ct. 2646, 2658–59, 57 L.Ed.2d 631 (1978). Although, as noted previously, regulations which do not physically invade private property may be considered takings, a taking is more likely to be found where the government action is a physical invasion. *See, U.S. v. Causby,* 328 U.S. 256, 266, 66 S.Ct. 1062, 1068, 90 L.Ed. 1206 (1946). Additionally, the court looks to the economic impact of the regulation on the claimant, *and* the extent to which the action interferes with "investment-backed expectations." *Goldblatt v. Hempstead,* 369 U.S. 590, 594, 82 S.Ct. 987, 990, 8 L.Ed.2d 130 (1960). Based on these factors, the court concludes that the effects of the NRA do not constitute a taking as prohibited by the Fifth Amendment to the Constitution.

The regulation does alter the value of undercharge claims held by the bankruptcy estates, and as such it has an adverse economic impact on the claimant.[10] However, the law clearly does not work an actual physical invasion of property. More important, there is considerable question as to whether or not this regulation interferes with the reasonable expectations of the debtor and the debtor's creditors.

The NRA only applies to undercharges for shipments that were made prior to September 30, 1990. The *Maislin* decision was issued in the Spring of 1990. This means that the NRA applies to claims that are the result of undercharges on shipments made *prior* to the Supreme Court's full reinstatement of

---

9. *See, U.S. v. Lopez,* —— U.S. ——, 115 S.Ct. 1624, 131 L.Ed.2d 626 (1995).

10. An argument can be made that this regulation does not actually impact the claimant negatively. With the recent switches in policy from the filed rate doctrine to the negotiated rates policy of the ICC in the 1980's, back to the filed rates doctrine in *Maislin* in 1990, and then, again to the negotiated rates policy through the NRA in 1993, these claims usually end up in litigation. As a result of the protracted controversy, creditors may not see a greater portion of the undercharges recovered than is provided for in the settlement provisions

of the NRA. During the hearing on the NRA, there was testimony that attorneys and auditors receive the bulk of the funds collected by trustees in undercharge litigation. Estimates given were between 50% and 80%. *See,* Johnson, Wayne, *The Negotiated Rates Act of 1993: Congress Curtails Undercharge Litigation in Bankruptcy by Amending the Filed Rate Doctrine,* 68 **Am.Bankr. L.J.** 319, n. 251 and accompanying text. It should be noted that bankruptcy trustees disputed this analysis. The court assumes in this opinion that the NRA has a substantial economic impact on the claimants.

the filed rates doctrine. At the time the carrier made the shipment, there was no reasonable expectation that it would later be able to recover for the undercharge since at that time the ICC was upholding the unreasonable practices defense. The court recognizes that it must also look to the expectations of the creditors, and must evaluate the bankruptcy estate from the time the debtor filed for bankruptcy, but the posture of the debtor prior to the filing is not irrelevant.

Until the 1980's, the filed rate doctrine was settled law. It was unquestioned. Following the passage of the MCA in 1980, and the policies of deregulation promulgated by the ICC in the 1980's, that doctrine was called into question. For many years, bringing undercharge litigation following a declaration of bankruptcy was considered an unreasonable practice. The courts generally accepted the ICC's interpretation and validated the "unreasonable practice" defense. Then in 1990, the Supreme Court reversed this trend and brought back the filed rate doctrine in full form. This stage would not last long either, however, in that Congress almost immediately went to work to overturn the Court's ruling in *Maislin*, at the Court's invitation. It seems unreasonable that a trustee could have expected that undercharge claims could or would continue to be enforced.

Congress has made a determination that in these cases the cost of the violation of the filed rates doctrine is to be borne by the carrier that charged and collected a rate lower than the filed rate. The court is not willing to say that there is or was a reasonable expectation on the part of the carriers, the trustees, or the creditors that any party would later be able to recover the difference between the charged rate, a rate that was negotiated for by the parties, and the filed rate. Therefore, the NRA does not constitute a taking as prohibited by the Fifth Amendment.

*2. Is there a violation of the principle of separation of powers?*

■ The plaintiff argues that the NRA should not apply to this action because Congress' actions in passing the bill violated the Constitutional principle of separation of powers. According to the plaintiff, Congress, by attempting to legislatively overrule the Supreme Court's decision in *Maislin*, thereby usurped the powers given to the judiciary by the Constitution. Plaintiff's argument fundamentally misinterprets the roles of the branches of our government and the powers given to them.

■ In its decision in *Maislin*, the Supreme Court rested its holding on the language chosen by Congress in the ICA. *Maislin*, 467 U.S. at 130, 104 S.Ct. at 2263. The Court simply interpreted the statute. Additionally, the Court noted that, should Congress desire a different result, it had the authority to change the statute. *Maislin*, 467 U.S. at 135–36, 104 S.Ct. at 2265–66. This is one of the most important elements of our form of government. Congress, the democratically elected branch, is vested with the power to correct Constitutional defects found by the Supreme Court to exist in statutes, or to fill a statutory void. Such action by Congress does not overrule decisions made by the Court, although that terminology is in popular use and that may be said to be the practical effect. Many statutes have been passed precisely for this reason. For example, the Civil Rights Act of 1990 was designed to counter several Court decisions with which Congress disagreed. This is an example of our elected officials governing, rather than leaving the population to the unchecked decisions of an unelected and unaccountable judiciary. Far from violating a Constitutional principle, when Congress votes to alter a statute in response to a Supreme Court decision that it believes was in error, it is an example of our government working precisely as it was intended. Accordingly, the NRA does not violate the Constitutional principle of separation of powers.

*3. Does the NRA Violate the Equal Protection Clause of the Fourteenth Amendment?*

■ The plaintiff also claims that the NRA violates the equal protection clause of the Fourteenth Amendment. The plaintiff asserts that the law arbitrarily singles out one group (trucking firms that are no longer operating) and treats them unfairly.

The first level of analysis in an equal protection claim is determining the proper level of scrutiny that the court should apply to the legislation. Where a law impinges on a fundamental right, or bases its application on a suspect classification such as race, then the court must apply heightened scrutiny. *See, Price v. Tanner,* 855 F.2d 820, 832 (11th Cir.1988), *cert. denied,* 489 U.S. 1081, 109 S.Ct. 1534, 103 L.Ed.2d 839 (1989); *Melton v. Gunter,* 773 F.2d 1548, 1550–51 (11th Cir.1985). There is no allegation that the law interferes with a fundamental right. Additionally, the law is clearly facially neutral, nor is there any allegation that it has been applied in a manner that discriminates against a traditionally suspect classification. Therefore, as a "purely economic classification," the law is valid so long as it is rationally related to a legitimate government function. *Melton,* 773 F.2d at 1551.

In this case, Congress determined that it was in the interests of the country that the undercharge crises be addressed. The NRA is the method that it decided was best. Clearly, alleviating the confusion and controversy in the area of interstate commerce is a legitimate function of the United States Congress. It is just as clear that the NRA and its provisions are a rational means for effecting Congress' intentions. Accordingly, the plaintiff's equal protection argument must fail.

### PRIMARY JURISDICTION

The doctrine of primary jurisdiction, according to the Supreme Court, is designed to promote "proper relationships between the courts and administrative agencies charged with particular regulatory duties." *U.S. v. Western Pacific R. Co.,* 352 U.S. 59, 63–64, 77 S.Ct. 161, 165, 1 L.Ed.2d 126 (1956). Primary jurisdiction may be invoked where a claim that is properly before the court nonetheless falls within the particular expertise of a government agency, such as the ICC. Under this doctrine, the court may retain jurisdiction, or it may dismiss the case without prejudice. *Reiter v. Cooper,* —— U.S. ——, ——, 113 S.Ct. 1213, 1220, 122 L.Ed.2d 604 (1993). The court also has the option of staying the proceedings, retaining jurisdiction and referring the matter to the agency for an administrative ruling. *Id.* The option rests with the court, though; it need not refer the matter to the agency if it does not desire to do so. *Id.*

In this particular instance, the doctrine of primary jurisdiction applies. This court clearly has jurisdiction over this matter, but it also has the option to refer the issues to the ICC for resolution by the agency. More important, the court has the option of dismissing this action without prejudice so that the parties may pursue the matter before the ICC. The court finds that this is the most appropriate course. In these matters, there is a clear need for uniformity. Already on different matters under the NRA the courts have produced varying results based on a wide range of rationales. The ICC has an expertise in this area, and it is appropriate for the courts to utilize that expertise in order to begin to sort the confusing and discordant set of decisions.

### CONCLUSION

For the reasons set forth above, the court finds that the NRA applies to this matter. Additionally, the court finds that the provisions of the bankruptcy code cited by the plaintiff do not preclude the application of the NRA. Also, the court finds that the NRA does not violate either the Fifth Amendment's prohibition of taking without just compensation, or the Constitutional principle of separation of powers, or the Fourteenth Amendment's equal protection clause. Finally, the court has determined that the issues remaining in this case should be pursued before to the ICC under the doctrine of primary jurisdiction. Accordingly, the Plaintiff's Motion for Summary Judgment is due to be DENIED and its claims are due to be DISMISSED without prejudice. A separate Order will issue in accordance with this Memorandum Opinion.